Richard NASH, Appellee,

v.

Glen R. JEFFES, Superintendent, State Correctional Institute at Dallas,

Philip S. Carchman, Mercer County Prosecutor, Appellant,

State of New Jersey, Department of Corrections, Intervenor.

No. 83–5261.

United States Court of Appeals, Third Circuit.

Argued Jan. 26, 1984.

Decided July 10, 1984.

Joseph H. Rodriguez, Public Defender, John Burke III (argued), Asst. Deputy Public Defender, East Orange, N.J., for appellee.

Philip S. Carchman, Mercer County Prosecutor, William J. Flanagan (argued), Asst. Prosecutor, Trenton, N.J., for appellant.

Irwin I. Kimmelman, Atty. Gen. of N.J., James J. Ciancia, Asst. Atty. Gen., Catherine M. Brown (argued), Victoria Curtis Bramson, Deputy Attys. Gen., Trenton, N.J., for intervenor.

Before GIBBONS and BECKER, Circuit Judges, and DUMBAULD, District Judge.*

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal presents two questions concerning the application of the Interstate Agreement on Detainers (the "IAD").[1] The first question is whether the IAD applies to a detainer based on a charge that a prisoner violated his probation. The second question is whether New Jersey, the state that filed the detainer, forfeited its right to insist on compliance with the standard procedures for requesting disposition of the charge underlying a detainer because its probation department advised the prisoner, who had informally requested that the charge be adjudicated, that a hearing would be held on the outstanding charge as soon as an attorney could be appointed for him.

Appellee Richard Nash filed a petition for a writ of habeas corpus in the United States District Court for the District of New Jersey, claiming that his probation violation hearing, at which he was sentenced to prison, was held in violation of Article III of the IAD. Article III requires that, when a jurisdiction that has ratified the IAD receives a request from a defendant incarcerated in another jurisdiction to adjudicate any "untried indictment, information, or complaint" on the basis of which a detainer has been filed, the adjudication

must take place within 180 days, or the charge must be dismissed. It also lays down certain requirements for requests for disposition of detainers. In spite of the great weight of authority holding that Article III did not apply to detainers based on probation violations, the district court held that it applied, and that a letter sent by Nash to the appropriate New Jersey authorities before he was sentenced in Pennsylvania constituted a request for disposition of the probation violation charge. Since the letter had been sent before Nash was sentenced in Pennsylvania, the court concluded that the 180-day period began to run on the sentencing date, July 13, 1979. Because the hearing on Nash's probation violation was not held within 180 days, the court held that New Jersey had failed to comply with Article III and therefore granted the writ. We agree substantially with the district court's conclusions, although we disagree with its exact calculation of the date on which the 180-day period began to run. This disagreement, however, has no effect on the outcome, and we therefore affirm.

## I.

On June 21, 1976, Nash pled guilty to breaking and entering with intent to rape in Mercer County, New Jersey. On October 29 of that year, he was sentenced to three years in prison, two of which were suspended, and to two years probation to follow. On June 13, 1978, while on probation, Nash was arrested in Montgomery County, Pennsylvania, for burglary, involuntary deviate sexual assault, and loitering. Eight days later the Mercer County Probation Department lodged a detainer against Nash, charging him with violating his probation.

* Honorable Edward Dumbauld, Senior Judge, United States District Court for the Western District of Pennsylvania, sitting by designation.

1. The IAD is a compact among forty-eight of the states, the District of Columbia, and the federal government, concerning the procedures to be followed when one jurisdiction files a detainer against a prisoner being held by another jurisdiction. See 18 U.S.C. Appendix; N.J.Stat.Ann. § 2A:159A–1 et seq. (West 19__); 42 Pa.Cons. Stat.Ann. § 9101 et seq. For purposes of application in federal habeas corpus proceedings and interpretation, the IAD is a federal law. See Cuyler v. Adams, 449 U.S. 433, 438, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981).

Nash was convicted in Pennsylvania on March 14, 1979. On April 13, Nash sent a letter to the Mercer County Prosecutor's Office, requesting assistance with the detainer filed against him. The prosecutor responded on May 16, recommending that Nash contact his probation officer. On May 17, Nash wrote a letter to his probation officer, in which he stated that "[w]hatever you can do with respect to lifting the [d]etainer, would be greatly appreciated." On May 23, the probation officer responded that, on the advice of Judge A. Jerome Moore, the criminal assignment judge, no further action would be taken until after Nash was sentenced in Pennsylvania.

Nash was sentenced in Montgomery County on July 13, 1979. Seven days later, he again wrote to his probation officer, referring to his May 17 letter and also restating his contention that the Montgomery County conviction was improper. On August 3, the probation office responded, informing Nash that a hearing would be held as soon as he was assigned a public defender. On that basis, Nash evidently concluded that Mercer County would proceed with the disposition of the detainer. When Nash received his "Sentence Status Report" on August 17, which advised him of the proper procedure for disposing of the detainer, he took no action.

On November 5, 1979, Nash again wrote to the probation department requesting final disposition of the probation violation detainer. He also sent a copy to Judge George Y. Schoch of the New Jersey Superior Court, who referred the letter to the prosecutor's office eight days later with a note suggesting that Nash "was invoking the terms of the [IAD]." The authorities then began to implement the IAD procedures. Nash executed the IAD "Form II," which was forwarded to Mercer County along with "Form IV" from the Pennsylvania authorities. Mercer County then returned a "Form VI" to the State Correctional institution at Dallas, Pennsylvania,

where Nash was confined, authorizing the Mercer County Sheriff's Office to obtain custody of Nash. On December 20, 1979, the Sheriff's officers arrived in Dallas to obtain Nash, only to find that he had been temporarily transferred to the Graterford Prison. Rather than seeking to obtain Nash from Graterford, Mercer County waited until Nash returned to Dallas to attempt to obtain custody.

Nash returned to Dallas on February 26, 1980, and a second "Form VI" was sent two days later. Nash refused to sign the papers necessary to transfer custody, however, and on March 6 filed a petition for a writ of habeas corpus in the District Court for the Middle District of Pennsylvania. The case was transferred to the District of New Jersey, pursuant to 28 U.S.C. § 1406, on February 3, 1981.[2] On July 24, 1981, after obtaining information concerning Nash's state court remedies from the Mercer County Prosecutor's Office, the district court stayed Nash's federal action pending exhaustion of his state court remedies. Nash then petitioned for habeas corpus in state court. Judge Richard J.S. Barlow of the New Jersey Superior Court denied Nash's motion to dismiss the probation violation charge on the basis of Article III, held that his Pennsylvania convictions constituted a probation violation, and re-sentenced him to consecutive eighteen-month sentences on his New Jersey convictions. The appellate division rejected Nash's appeal based on the failure of Mercer County to observe the time limits of Article III of the IAD, and the New Jersey Supreme Court denied certification.

Nash then returned to federal court. The district court held a hearing on January 4, 1983. On March 21, the court filed an opinion granting the writ of habeas corpus. *Nash v. Carchman*, 558 F.Supp. 641 (D.N.J.1983). As we have noted, the court held that Article III of the IAD applies to detainers based on probation violations. The court reasoned that one of the pur-

---

2. In the interim, Nash had amended his petition a number of times, had filed a habeas corpus petition in New Jersey Superior Court which was rejected by Judge Schoch, and had re-filed his federal habeas corpus petition in the Middle District of Pennsylvania.

poses of the IAD, disposing of outstanding charges expeditiously to protect prisoners, covered detainers based on probation violation charges. The court buttressed its reasoning with citations to the legislative history, particularly that of the Council of State Governments which drafted the IAD. The court also determined that Nash's failure to comply with the technical provisions of Article III for demanding disposition of the outstanding charge was attributable to "bad advice" which Nash received from the New Jersey authorities in response to his April 13, 1979 letter. The court then held that, in light of their responsibility, New Jersey could not rely on this failure, and that therefore the 180-day period for disposition of the probation violation charge began running on the date Nash was sentenced, July 13, 1979.[3] The Mercer County Prosecutor appealed. The State of New Jersey, Department of Corrections, pursuant to leave of this court, has intervened on the side of the prosecutor.

## II.

Article III states in relevant part:

(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint ....

N.J.Stat.Ann. § 2A:159A–3(a) (emphasis added). The primary question before us is whether a detainer based on a probation violation is "an untried indictment, information, or complaint," and thus covered by Article III of the IAD.

Other than the district court in this case, there is only one reported decision which applies Article III in this context. *Gaddy v. Turner,* 376 So.2d 1225 (Fla.App.1979). The same court later reversed itself in the interest of uniformity. *Irby v. Missouri,* 427 So.2d 367 (Fla.App.1983). Otherwise, the courts which have decided the issue are unanimous in holding that Article III does not apply where the detainer is based on a parole or probation violation.[4] The analysis of the district court in this case, however, is considerably more comprehensive than that of any of the courts which have dealt with the issue previously. Although the authority on the other side is entitled to considerable weight, the strength of the district court's analysis far exceeds that of the opinions reaching the opposite result.

In *Hopper v. United States Parole Commission,* 702 F.2d 842 (9th Cir.1983), the court held that an unadjudicated parole violation is not an "untried complaint." The court looked to the use of terms in the legislative history, which indicated to it that the relevant phrase in Article III should be given a "technical" interpretation, and held that Congress in adopting

---

**3.** Under the terms of Article III, the 180-day period cannot begin running until the prisoner "has entered upon a term of imprisonment ...." The district court held that, in light of this language, the 180-day period could not begin running until Nash was sentenced. In light of our conclusion that the period began running after July 13, 1979, *see infra* part III, we have no reason to review this aspect of the district court's holding.

**4.** *See Hopper v. United States Parole Comm'n,* 702 F.2d 842 (9th Cir.1983); *Hernandez v. United States,* 527 F.Supp. 83 (W.D.Okla.1981); *Sable v. Ohio,* 439 F.Supp. 905 (W.D.Okla.1977); *Padilla v. Arkansas,* 279 Ark. 100, 648 S.W.2d 797 (1983); *People v. Jackson,* 626 P.2d 723 (Colo.App.1981); *Maggard v. Wainwright,* 411 So.2d 200 (Fla.App.1982); *Wainwright v. Evans,* 403 So.2d 1123 (Fla.App.1981); *Suggs v. Hopper,* 234 Ga. 242, 215 S.E.2d 246 (1975); *Buchanan v. Michigan Department of Corrections,* 50 Mich. App. 1, 212 N.W.2d 745 (1973); *People ex rel. Capalongo v. Howard,* 87 App.Div.2d 242, 453 N.Y.S.2d 45 (1982); *People v. Batalias,* 35 App. Div.2d 740, 316 N.Y.S.2d 245 (1970); *State v. Knowles,* 275 S.C. 312, 270 S.E.2d 133 (1980); *Blackwell v. State,* 546 S.W.2d 828 (Tenn.Cr. App.1976).

the IAD used "untried indictment, information, or complaint" in the technical sense of an unprosecuted accusation of a new offense. 702 F.2d at 846. Some of the other courts that have reached this result have also relied on a technical interpretation of the language,[5] while others have relied on administrative concerns [6] or the indications in the legislative history that Article III is primarily concerned with the "speedy trial" rights of prisoners—a concern not usually relevant when probation violations are involved.[7]

The district court, on the other hand, looked at the broader purposes of the legislation. The court cited legislative history for the proposition that, in addition to the speedy trial rights of prisoners, the drafters of Article III were concerned with the need to settle outstanding charges against prisoners, in order to enable the prisoners to participate in rehabilitative programs. In advancing this proposition, the district court relied heavily on the most important legislative history of the IAD, the statements of the Council of State Governments which drafted it in 1956. These statements, in describing the problems that created the need for the statutes, point to the detrimental effect of an outstanding detainer on the prisoner's ability to be rehabilitated, a concern which is equally applicable whether the detainer is based on a pending indictment for a new crime or a probation violation charge. As one commentator has summed it up:

> The thrust of [the IAD] is not to protect the convict's right to a speedy trial per se, but rather to protect him from the particular disabilities engendered by an untried detainer pending against him while he is serving a prison term. Often the effect of such a detainer, which could be based upon an unsubstantiated charge, is to aggravate the punishment received for the original offense.

Note, *The Right to a Speedy Trial and the New Detainer Statutes*, 18 Rutgers L.Rev. 828, 832 (1964) (footnote omitted).

As the Eighth Circuit has noted, there are numerous consequences to a prisoner when a detainer remains outstanding against him:

> [T]he inmate is (1) deprived of an opportunity to obtain a sentence to run concurrently with the sentence being served at the time the detainer is filed; (2) classified as a maximum or close custody risk; (3) ineligible for initial assignments to less than maximum security prisons (i.e., honor farms or forestry camp work); (4) ineligible for trustee status; (5) not allowed to live in preferred living quarters such as dormitories; (6) ineligible for study-release programs or work-release programs; (7) ineligible to be transferred to preferred medium or minimum custody institutions within the correctional system, which includes the removal of any possibility of transfer to an institution more appropriate for youthful offenders; (8) not entitled to preferred prison jobs which carry higher wages and entitle them to additional good time credits against their sentence; (9) inhibited by the denial of possibility of parole or any commutation of his sentence; (10) caused anxiety and thus hindered in the

**5.** *See State v. Knowles*, 275 S.C. 312, 270 S.E.2d 133 (1980); *Suggs v. Hopper*, 234 Ga. 242, 215 S.E.2d 246 (1975); *Blackwell v. State*, 546 S.W.2d 828 (Tenn.Cr.App.1976).

**6.** *See Suggs v. Hopper*, 234 Ga. 242, 215 S.E.2d 246 (1975); *Irby v. Missouri*, 427 So.2d 1123 (Fla.App.1983); *Wainwright v. Evans*, 403 So.2d 1123 (Fla.App.1981).

**7.** *See People v. Jackson*, 626 P.2d 723 (Colo.App. 1981). Where a probation violation charge is based on a conviction in another state, delay will generally pose little risk to the prisoner's opportunity for a fair adjudication of the charge, since the conviction itself will be con-

clusive proof of the probation violation. Where the charge is based on another type of violation, such as a non-criminal act which is prohibited by the terms of probation, on which evidence such as live testimony may be relevant, the prisoner's opportunity for a fair adjudication may be compromised by delay. Although there is no constitutional right to a speedy adjudication in probation violation cases, we believe that concern for a fair adjudication, as well as concern for constitutional rights, should inform our interpretation of the IAD. This concern will be relevant in a significant number of cases.

overall rehabilitation process since he cannot take maximum advantage of his institutional opportunities.

*Cooper v. Lockhart,* 489 F.2d 308, 314 n. 10 (8th Cir.1973). The district court took notice of these possible consequences, 558 F.Supp. at 644, and concluded that, given the "broad purposes" of the Act, it should be liberally interpreted to effect those purposes.[8]

We find the district court's reasoning persuasive. The legislative history cited by the district court makes it clear that the consequences to a prisoner of an outstanding detainer were well known to the drafters of the IAD and the legislatures that enacted it. A quick adjudication of the charges underlying a detainer is desirable, not only to vindicate a prisoner's constitutional right to a speedy trial, but also to provide certainty as to the time of his scheduled release, in order to aid in his rehabilitation. Many prison rehabilitative programs are not open to prisoners with outstanding detainers. Although this may make sense from the perspective of the prison system, since the limited resources available for programs to prepare prisoners for freedom should not be wasted on prisoners who are not going to be released at the end of their current term, it emphasizes the importance of requiring that the charges underlying detainers be finally adjudicated at the beginning, rather than the

end, of the sentence. Fairness to the prisoner and proper allocation of society's resources require that detainers be promptly removed unless the prisoner has been finally and constitutionally sentenced to further imprisonment on the basis of the charge underlying the detainer. This is true regardless of whether the detainer is based on an indictment or on a probation violation. The legislative history indicates that this was a concern of the people who drafted the IAD. The current national debate over the need to improve the rehabilitative functions of our prison system, *see supra* n. 8, only highlights the importance of avoiding a situation in which a prisoner is denied access to rehabilitative programs because of a detainer based on charges which have not been finally adjudicated.

For these reasons, we decline to adopt a technical interpretation of the relevant language of Article III. We have considered the administrative burdens of applying Article III to probation violations.[9] One such burden is the cost of transporting prisoners in order to provide them with a probation revocation hearing.[10] Given the burdens the detainer placed on the prisoner, we do not feel that this additional expense outweighs the interest in quick adjudication.

A second burden is the additional paperwork which would be required by applying Article III to probation violations.[11] The volume of such paperwork, like the extra

---

**8.** The importance of the values taken cognizance of by the district court is underscored by the recent statements of Chief Justice Burger about the deplorable state of the American prison system and the need for vastly improved programs of rehabilitation within the prisons. "[O]ne of the reasons, if not the major reason, why rehabilitation has not worked is that in most of the prisons we have not had work and training and education.... If they go in as functional illiterates and come out as illiterates, and in the meantime have acquired this terrifying experience ... they're going to be worse people, they're going to be back in again." Chief Justice Burger, speaking on Nightline, ABC TV, June 19, 1984.

**9.** Although we doubt that these administrative burdens were considered by the drafters of the IAD or the legislatures which adopted it, our analysis of the legislative history is based on policy and we feel that the additional cost of

expanding the scope of Article III is relevant to our policy analysis.

**10.** Although this is a burden which the state must ultimately assume unless the charge is dismissed, requiring adjudication before the out-of-state sentence has been served increases the cost because it requires an additional trip.

**11.** In the probation violation context, the notice to the prosecutor and the judge required by Article III places the appropriate officials on notice of the prisoner's request for adjudication under the IAD. We note that if this were a parole violation rather than a probation violation, the notice required by the IAD might not be appropriate to inform the state officials with jurisdiction over the outstanding charge. If so, parole violation charges might lapse without the appropriate officials receiving notice, or require the state to engage in a potentially costly rerouting of requests for adjudication of parole

cost of transporting prisoners for probation violation hearings while they are still imprisoned in other states, does not outweigh the burden which a detainer placed on the prisoner. Although, as discussed below, it would be burdensome to require prosecutors and judges to scrutinize every letter from a probationer against whom a detainer was outstanding, this problem can be alleviated by requiring probationers to comply with the formal notice requirements of Article III. Therefore, we do not find that the administrative burdens created by applying Article III to detainers based on probation violations outweigh the benefits to probations. In sum, we hold that a probation violation is a "complaint" within the meaning of Article III of the IAD.

### III.

■ Appellant argues that, even if Article III applies in the probation violation context, the state complied with its requirements by providing Nash with a hearing within 180 days of the receipt of the formal request for disposition from the Pennsylvania correction authorities. Appellant argues that a series of letters that Nash sent to New Jersey officials between April 13, 1979, and July 20, 1979, did not constitute notice that he was invoking the IAD, and thus did not trigger the 180-day period prescribed by Article III.[12]

The courts have generally required that prisoners must strictly comply with IAD procedures before they will dismiss charges on the basis of a violation of Article III. See Williams v. Maryland, 445 F.Supp. 1216, 1220 (D.Md.1978); Gray v. Benson, 443 F.Supp. 1284, 1286 (D.Kansas 1978); People v. Primmer, 59 A.D.2d 221, 222, 399 N.Y.S.2d 478, 480 (1977), aff'd, 46 N.Y.2d 1048, 389 N.E.2d 1070, 416 N.Y. S.2d 548 (1979); State v. Brockington, 89 N.J.Super. 423, 430, 215 A.2d 362, 365–66 (1965). Subsection (b) of Article III, N.J.

Stat.Ann. § 2A:159A–3(b), requires that a request for disposition of charges be sent by the prisoner to his custodian, who then must forward the request to the officials of the jurisdiction that filed the detainer. This requirement is necessary, because the prosecuting authorities cannot be expected to analyze each communication from a prisoner with a fine-tooth comb to determine whether it should be construed as invoking the IAD. Routing a request for disposition through the prisoner's custodian also allows the custodian to file supporting documents contemporaneously with the request. Article III is not designed as a trap for unwary prosecuting officials, but as a systematic method of rapidly adjudicating charges against prisoners held in another jurisdiction. The technical requirements for filing a request for disposition further the underlying purpose of rapid adjudication.

The district court, in finding an exception applicable to this case, relied on cases holding that where the failure to strictly comply was the fault of one of the jurisdictions involved rather than the petitioner, technical compliance will be excused. See Schofs v. Warden, FCI, Lexington, 509 F.Supp. 78, 82 (E.D.Ky.1981); United States v. Hutchins, 489 F.Supp. 710, 714–15 (N.D. Ind.1980). See also Pittman v. State, 301 A.2d 509 (Del.1973); State v. Wells, 186 N.J.Super. 497, 453 A.2d 236 (App.Div. 1982). The district court held that the "misleading information" received by Nash from the New Jersey authorities in response to his April 13, 1979, letter concerning the appropriate procedures for disposition of the detainer excused his failure to comply with Article III procedures. In reaching this conclusion, the court failed to take account of the fact that, under the prevailing interpretation of the IAD, Article III did not apply to Nash's detainer. Thus, in referring Nash to his probation officer, the New Jersey authorities may

---

violation charges. We need not decide here whether this distinction is in fact valid or whether it would lead us to a different result.

**12.** If appellant is correct, Nash's refusal to cooperate with efforts to transfer custody, instituted by New Jersey on February 28, 1980, would fall

within the 180-day period, and he would thus be prevented from raising his Article III claim, since the failure to hold a hearing within the 180-day period would be attributable to him, not the state.

well have been acting properly based on a good-faith belief that Article III did not apply to Nash's request that the probation violation charge be adjudicated.

We need not reach this question, however, because we believe that the letter of August 3, 1979, in which the probation department informed Nash that a hearing would be held as soon as an attorney could be appointed for him, constituted an acknowledgment on the part of New Jersey that Nash's letters were being treated as a request for disposition of the probation violation charge. On the basis of that letter, Nash was justified in taking no further action when, two weeks later, the Pennsylvania authorities provided him with a "detainer procedure notice." New Jersey, rather than Nash, should bear the responsibility for the delay between August and November, when another letter from Nash to the probation department finally led to the institution of formal proceedings on the probation violation charge.[13]

## IV.

We conclude that an outstanding charge of a probation violation claim is an "untried indictment, information, or complaint" within the meaning of Article III of the IAD. We further hold that, under the circumstances of this case, the appellee was excused from technical compliance with the notice requirements of Article III, that the 180-day period for adjudication of the probation violation charge began running on August 3, 1979, and that therefore the charge should have been dismissed when the hearing was not held by January 30, 1980. The judgment of the district court will be affirmed.

DUMBAULD, Senior District Judge, concurring in part and dissenting in part.

I agree that a pending detainer charging probation violation is an "untried ... complaint on the basis of which a detainer has been lodged against the prisoner" within the meaning of Article III of the Interstate Agreement on Detainers, which provides for disposition within 180 days.

I disagree with part III of the majority opinion, believing that the prisoner Nash's own deliberate refusal (on February 28, 1980) to utilize the established standard procedure for disposition of interstate detainers prevented disposition of the pending charge against him within the 180-day period. He chose rather to seek federal habeas corpus on March 6th. *Exitus actum probat*, but I would uphold his New Jersey sentence for probation violation.

---

13. The fact that Nash's hearing was again delayed due to his transfer within the Pennsylvania correctional system, and that without this delay his probation violation proceeding would have fallen within the 180-day period, does not excuse New Jersey from the 180-day requirement. Had the New Jersey authorities acted in a timely manner in August, Nash's transfer from the Dallas prison to Graterford would not have delayed the adjudication of the probation violation charge. Given their failure to do so, the burden of obtaining custody of Nash from Graterford fell on the shoulders of the state officials.