Steven J. CASPER, M–8294, Appellant,

v.

Joseph RYAN, and the Attorney General of the State of Pennsylvania, and the District Attorney for Philadelphia County.

No. 86–1346.

United States Court of Appeals, Third Circuit.

Argued Feb. 19, 1987.

Decided June 26, 1987.

Rehearing and Rehearing In Banc Denied July 22, 1987.

⌾⇒57

Edward H. Weis (argued), Defender Ass'n of Philadelphia, Federal Courts Div., Philadelphia, Pa., for appellant.

Donna G. Zucker, Asst. Dist. Atty., Suzan Willcox (argued), Asst. Dist. Atty., Gaele McLaughlin Barthold, Deputy Dist. Atty., William G. Chadwick, First Asst. Dist. Atty., Ronald D. Castille, Dist. Atty., Philadelphia Dist. Atty's Office, Philadelphia, Pa., for appellees.

Before HIGGINBOTHAM, SLOVITER, Circuit Judges, and ROTH, District Judge [*]

SLOVITER, Circuit Judge.

Steven Casper appeals from the district court's denial of his petition for a writ of habeas corpus. Casper contends that he was improperly tried for theft and criminal conspiracy in Pennsylvania because Pennsylvania violated Article III(a) of the Interstate Agreement on Detainers (IAD),[1] which requires that a prisoner be tried on outstanding criminal charges within 180 days of his request to be tried, and Article V(c) of that Agreement, which requires that the indictment be dismissed with prejudice if the trial is not commenced within that time.

## I.

### Facts

Casper was arrested on May 31, 1980 in Philadelphia for burglary and related charges. Before trial, Casper jumped bail and fled to Florida where he was arrested on two counts of burglary. On July 22, 1980, the Philadelphia District Attorney's office lodged detainers in Florida against Casper.

On December 2 and December 8, 1980, Casper was sentenced in Florida on the two burglary charges. At the December 8 hearing, Casper entered a plea agreement which provided that the Florida sentence would be concurrent with any sentence imposed on charges then outstanding against him in Pennsylvania and that he would waive extradition and return to Pennsylvania. App. at 35.

On December 11, 1980, the Philadelphia District Attorney initiated proceedings to secure the return of Casper so that he could stand trial pursuant to Article IV(a) of the IAD. That Article entitles a prosecutor in a jurisdiction in which an untried indictment, information, or complaint is pending "to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State" made available upon presentation of a written request for temporary custody or availability to the appropriate authorities of the

[*] Hon. Jane R. Roth, United States District Court for the District of Delaware, sitting by designation.

1. Forty eight states, all but Louisiana and Mississippi, have adopted the IAD. In Florida and Pennsylvania it is codified at, respectively, F.S.A. §§ 941.45–941.50 and 42 Pa.Cons.Stat. Ann. § 9101. The United States has also adopted the IAD by virtue of the Interstate Agreement on Detainers Act (IADA), 18 U.S.C. App.III § 2.

State in which the prisoner is incarcerated, provided that the relevant court in the requesting state approves, and subject to a thirty day period for the Governor of the sending state to disapprove. IAD Form 5 is the "Request for Temporary Custody" sent by the authorities of the requesting jurisdiction to the authorities of the jurisdiction where the prisoner is in custody.[2]

Article IV(b) of the IAD provides that upon receiving the request for temporary custody, the authorities having the prisoner in custody shall furnish the requesting authority with a certificate containing information regarding the prisoner's sentence, time served and remaining to be served, good time, parole eligibility, and decisions of the state parole agency. Form 3, entitled "Certificate of Inmate Status," effectuates this provision. The custodial authorities also complete and send the requesting authorities Form 4, an "Offer to Deliver Temporary Custody," which requires the inmate's signature and contains the offer of the custodial state to deliver temporary custody of the prisoner for trial. *See* App. at 122, 121. The custodial authorities must also furnish similar certificates and notice to the other authorities in the receiving state who have lodged detainers against the prisoner.

Under Article III(c), when a detainer is lodged against a prisoner, the custodial official must inform the prisoner of the detainer and of the prisoner's right to request a final disposition of charges on which the detainer is based. Form 1 is used for this purpose. Article III(a) gives the prisoner the right to request a final disposition of the untried charges, which the prisoner can initiate by sending Form 2, the "Inmate's Notice of Place of Imprisonment and Request for Disposition of Indictments, Informations, or Complaints," which contains a waiver of extradition.

Article III(a) of the IAD requires that the request of the prisoner for final disposition "shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decision of the State parole agency relating to the prisoner," which is the same language used in Article IV(b) to describe the information needed. Forms 3 and 4, which are used when proceedings have been initiated by the prosecutor from another jurisdiction under Article IV, must also be attached to Form 2, used when an inmate requests disposition under Article III.

When the prosecution initiates the return of the prisoner for trial under Article IV, the trial must begin within 120 days of the prisoner's *return* to the receiving state. In contrast, when the prisoner initiates his or her return under Article III, trial must begin within 180 days after the receiving authorities *receive the prisoner's request* for trial.

In Casper's case, the first relevant date is December 11, 1980 when Philadelphia initiated the proceedings by sending a request for temporary custody to Florida. Although the Florida authorities completed the responsive forms (3 and 4) by December 19, 1980, App. at 122, 121, they were not then sent to Philadelphia. The Florida authorities also prepared a notification of detainer and rights (Form 1) which was delivered to Casper on February 25, 1981. App. at 123.

Casper then wrote a letter dated February 27, 1981, which was notarized, stating that he wished to return to Pennsylvania to dispose of all charges. App. at 124. This letter, addressed to "Philadelphia City Hall," was received in the Philadelphia District Attorney's office on March 12, 1981. Since Casper's letter did not include a Form 3, the Philadelphia District Attorney's Office was not provided at this time with the information regarding time served, parole status etc. which the statute provides must

---

**2.** Following the adoption of the IAD, standard forms were adopted for use in all proceedings under the agreement. *See* The Council of State Governments, *The Handbook on Interstate Crime Control* 125–33 (1978).

accompany the prisoner's request for disposition of outstanding charges.

Montgomery County, Pennsylvania had burglary charges pending against Casper, and on March 9, 1981 it also sent a Form 5 to Florida requesting temporary custody. App. at 125. In response, the Florida authorities completed the Certificate of Inmate Status (Form 3) and the Offer to Deliver Temporary Custody (Form 4) on March 24, 1981. App. at 126, 127. On March 27, 1981, Casper completed what was apparently his first Form 2 request for disposition of outstanding indictments, informations or complaints. App. at 128. These forms were not transmitted to either the Philadelphia or Montgomery County prosecutors at that time.

Upon receipt of Casper's letter on March 12, 1981, Richard DiBenedetto, the Philadelphia Deputy District Attorney for Intergovernmental Affairs, telephoned the Florida correctional facility where Casper was imprisoned asking about Florida's offer to deliver custody, and was told that Casper could not be sent to Philadelphia until authorization was received from Charles Lawson, the Florida Interstate Compacts Administrator. App. at 94. On March 27, 1981, Lawson told DiBenedetto that inmates were not being sent until procedures had been instituted for pretransfer hearings for prisoners who did not waive extradition, as required by a recent Supreme Court decision. App. at 95; *see Cuyler v. Adams*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981).

On April 16, 1981, Lawson wrote to DiBenedetto that Casper refused to waive extradition for Montgomery County and "is not interested in being transported to Pennsylvania at this time under the Agreement on Detainers." [3] By that time, Casper had written to Philadelphia, albeit informally, to request trial, and had signed a Form 2, which contains the waiver of extradition, for Montgomery County. App. at 128. There is no explanation in the record for Lawson's statement with respect to Casper's disinterest in returning to Pennsylvania.[4]

Without explanation for the delay, Florida sent Forms 2 and 4 which had been signed by Casper as well as the Form 3 certificate to the Philadelphia District Attorney's office on June 4, 1981. App. at 130. Casper arrived in Pennsylvania on June 24, 1981. He was tried by a jury in Philadelphia on burglary, theft and conspiracy charges at a trial which began on October 6, 1981. This was less than 120 days after Casper's arrival in the state, and thus met the requirement of Article IV of the IAD, applicable when the transfer is initiated by the receiving state. It was, however, 208 days after Casper's letter to "City Hall" was received by the Philadelphia District Attorney's Office, and hence more than the 180 day period provided by Article III.

Casper was convicted of criminal conspiracy, theft by unlawful taking or disposition, and theft by receiving stolen property.[5] In his unsuccessful post-trial motion

**3.** The letter stated, in part:

In response to your request of March 6 and March 12, 1981, this is to advise that this individual has been contacted by Mr. Fortner, Classification Supervisor at Marion Correctional Institution, on March 27, 1981 at which time he indicated that to date we have not received a detainer from Philadelphia. However, this individual has refused to sign the Form 2 for Montgomery County, Pennsylvania indicating that he is not interested in being transported to Pennsylvania at this time under the Agreement on Detainers.

Because of a recent Supreme Court ruling, Cuyler vs. Adams, U.S. Supreme Court No. 78–1841, we are not in a position to make a Florida inmate available to another state under the Agreement on Detainers until we are

in a position to formalize our procedure for judicial hearings. It is therefore requested that you maintain contact with us in order to indicate your interest at a later date in returning this individual to Pennsylvania under the provisions of the Agreement on Detainers. App. at 129.

**4.** An Assistant Defender in Philadelphia, Daniel Walls, advised Casper by letter dated March 5, 1981, "at this time *not* to file anything in regard to the Montgomery County cases, because I think your chances of getting concurrent time there are less than [in Philadelphia]." Nonetheless, Casper signed Form 2 later that month.

**5.** Prior to the trial and convictions at issue in this case, Casper was sentenced on other charges on September 28, 1981. Casper also

in the Pennsylvania trial court, Casper argued that trial was governed by Article III of the IAD, applicable when a prisoner initiates the transfer, and that Pennsylvania failed to comply because it brought him to trial more than 180 days after it received his request for trial. Casper appealed his conviction to the Pennsylvania Superior Court assigning the IAD claim as error. The Superior Court held that both the 180–day limit of Article III and the 120–day limit of Article IV applied since both Casper and the prosecution made requests for Casper's return. App. at 31. The Superior Court "assume[d] *arguendo*" that the letter Casper wrote requesting a speedy trial, which was received on March 12, 1986, was effective and concluded that based on that date, the trial beginning on October 6, 1981 did not begin within the 180–day limit. App. at 31. The Superior Court, however, relying *inter alia* on the April 16, 1981 letter from Florida, concluded that Casper withdrew his only effective request to be tried in Philadelphia pursuant to Article III(a), App. at 32, and stated, "We are convinced that this streetwise and prison-wise appellant was playing with the system to suit his own whims and desires." App. at 31. The Superior Court affirmed Casper's conviction on March 22, 1985. Casper filed a petition for allowance to appeal to the Pennsylvania Supreme Court, alleging that his trial was untimely under the IAD. His petition was denied.

Casper next filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition alleged Casper's IAD claim and factfinding by the Superior Court as the principal grounds for error.[6]

The district court concluded that Casper's IAD claim was without merit. Although the district court noted that "[o]n the amplified record now before this court, there is reason to doubt the accuracy of the Superior Court's assessment" of Casper's efforts to return to Pennsylvania and that "it might well be that petitioner's trial was untimely by a couple of weeks," App. at 184, the court concluded that Casper's constitutional rights had not been violated and denied the writ. Casper appeals. We granted a certificate of probable cause, and thus reach the merits of his contentions.

## II.

### *Propriety of Habeas Relief*

Casper argues that because he was not tried within 180 days of his request for a full and speedy disposition of the Pennsylvania charges against him as required by Article III of the IAD,[7] he was entitled to a dismissal of the charges with prejudice under Article V(c) of the IAD.[8] Casper also

pleaded guilty to the Montgomery County charges. These convictions are not at issue in this appeal.

**6.** Casper also alleged ineffective assistance of counsel. Although the magistrate to whom the case was initially assigned believed that the ineffective assistance of counsel claim had not been exhausted, the district court disagreed, and neither party challenges its exhaustion finding on appeal.

**7.** Article III(a) provides:

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's

jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint: *Provided,* That, for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

42 Pa.Cons.Stat.Ann. § 9101; 18 U.S.C. App.III § 2.

**8.** Article V(c) provides:

If the appropriate authority shall refuse or fail to accept temporary custody of said person, or in the event that an action on the indictment, information, or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in article III or article IV hereof, the appropriate court of the jurisdiction where the indictment, information, or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect.

argues that the Pennsylvania Superior Court incorrectly concluded that he refused to sign the Montgomery County Form 2 and that he withdrew his earlier request to be transferred to Pennsylvania. The district attorney argues first, that the mere assertion that a state prisoner has not been timely tried under the IAD does not, without more, present a claim cognizable in a federal habeas corpus action and, second, that in any event, Casper's letter received March 12, 1981 was insufficient to trigger the 180 day provision of Article III of the IAD.

■ We consider first the District Attorney's argument that habeas relief is not available for the type of violation of the IAD that is at issue here. As a general rule, "'collateral relief is not available when all that is shown is a failure to comply with the formal requirements' of a rule of criminal procedure in the absence of any indication that the defendant was prejudiced by the asserted technical error." *Davis v. United States,* 417 U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974) (quoting *Hill v. United States,* 368 U.S. 424, 429, 82 S.Ct. 468, 472, 7 L.Ed.2d 417 (1962)). "[T]he appropriate inquiry [is] whether the claimed error of law was 'a fundamental defect which inherently results in a complete miscarriage of justice,' and whether '[i]t ... present[s] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.'" *Id.* (quoting *Hill,* 368 U.S. at 428, 82 S.Ct. at 471).

In dismissing Casper's application for a writ of habeas corpus based on an IAD violation, the district court appeared to construe the scope of 28 U.S.C. § 2254 as limited to constitutional violations. The court stated, "the decisive issue in the present context is whether petitioner's constitutional rights have been violated" and that "[a] possible technical violation of state law does not add up to denial of a speedy trial under the United States Constitution, violation of due process, or inadequate representation by counsel." App. at 184. The language of section 2254 is not limited to constitutional violations since it also requires a district court to entertain an application for a writ of habeas corpus by a state prisoner who alleges that he is in custody "in violation of the ... laws or treaties of the United States." 28 U.S.C. § 2254. For purposes of federal habeas corpus proceedings under § 2254, the IAD is a federal law. *See Cuyler v. Adams,* 449 U.S. 433, 438, 101 S.Ct. 703, 706, 66 L.Ed.2d 641 (1981); *Shack v. Attorney General of Pennsylvania,* 776 F.2d 1170, 1172 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1234, 89 L.Ed.2d 342 (1986).

In addition, the district court did not discuss the effect of our decision in *United States v. Williams,* 615 F.2d 585 (3d Cir. 1980), upon which Casper relies. In *Williams,* we held that a claimed violation of Article IV(e) of the IADA, which requires the receiving authority to dispose of all pending charges prior to returning the defendant to the original place of imprisonment, amounted to a "fundamental defect" or "exceptional circumstance" and we concluded that "Williams' allegation of an IADA violation is the type of statutory claim cognizable in a section 2255 action." *Id.* at 590. Even before the *Williams* decision, we had held in *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 834–39 (3d Cir.1975), that a state prisoner stated a cause of action cognizable under 28 U.S.C. § 2254 when he alleged that he had been transported from a federal prison at the state's request and returned to the federal prison without having been tried in the state in violation of Article IV(e) of the IADA. Relying on these two cases, and on *Nash v. Jeffes,* 739 F.2d 878 (3d Cir.1984), *rev'd sub nom Carchman v. Nash,* 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985), where we affirmed the district court's grant of habeas relief when the receiving state failed to try a prisoner within the 180 days allowed by Article III, Casper argues that he is entitled to a writ of habeas corpus or at least to a hearing in the district court on his petition.

We believe that Casper confuses two separate issues: the question whether a claim

of an IAD violation is cognizable in a section 2254 or 2255 proceeding is a different one than whether the petitioner who can establish only a minor violation is entitled to the writ sought. The binding precedent of our decisions in *Williams* and *Esola* is that the IAD is a "law[ ] of the United States" and that a prisoner is therefore entitled to invoke sections 2254 or 2255 by alleging an IAD violation. However, in *Williams*, we also stated, "Whether collateral relief is *granted* may turn on the merits of the alleged violation, but we do not believe the availability of collateral relief should be so determined." 615 F.2d at 590 n. 4 (emphasis in original). In fact, we denied collateral relief to Williams because the method by which he was transferred had not then been held to be governed by the IADA. *Id.* at 592–93. Similarly, in *Esola*, we stated: "[w]e emphasize that we decide no more in this case than that a cause of action is stated by the apparent failure of New Jersey to comply with the terms of the Agreement." 520 F.2d at 839. In light of the "very incomplete record before this Court," we remanded the matter to the district court for development of a full record. *Id.* We specifically noted that what we were deciding was that a claimed IAD violation stated a claim over which the federal court had jurisdiction to grant habeas corpus relief. *Id.* at 834 & n. 16, 839.

In this case, the district court did not hold that the petition failed to state a claim upon which relief could be granted, as Casper states. Appellant's Brief at 16. Instead, the court considered and dismissed the petition on the merits of the claim based on the amplified record before it,

which included the record of the Pennsylvania proceedings. While the district court's limited view of section 2254 was erroneous, it is also possible to read its opinion as holding that Pennsylvania's "possible technical violation" of the IAD in commencing Casper's trial "a couple of weeks" late does not provide a basis for granting habeas relief.

We are bound by our holdings in *Williams* and *Esola* that a violation of the anti-shuttling provision of the IADA may warrant habeas relief, even without a showing of prejudice,[9] notwithstanding that this is contrary to the mainstream of precedent elsewhere. *See Greathouse v. United States*, 655 F.2d 1032, 1034 (10th Cir.1981) (per curiam), *cert. denied*, 455 U.S. 926, 102 S.Ct. 1289, 71 L.Ed.2d 469 (1982) ("Absent special circumstances, violations of [Article IV(e) of] the IADA are not grounds for collateral attack ... under § 2255"); *Huff v. United States*, 599 F.2d 860, 863 (8th Cir.), *cert. denied*, 444 U.S. 952, 100 S.Ct. 428, 62 L.Ed.2d 323 (1979) (alleged violation of Article IV(e) trial before return provision not cognizable under § 2255 absent showing of prejudice); *Edwards v. United States*, 564 F.2d 652 (2d Cir.1977) (per curiam) (violation of Article IV(e) trial before return provision not cognizable under § 2255 because no showing of fundamental defect). *But see Webb v. Keohane*, 804 F.2d 413, 414 (7th Cir.1986) (violation of Article IV(e) trial before return provision cognizable in a federal habeas petition).

However, neither *Williams* nor *Esola* stands for the proposition that any minor violation of any IAD provision requires a federal court to grant habeas relief.[10] It is

---

9. In neither *Williams* nor *Esola* did we discuss whether prejudice must be shown, although a fair reading of the language of the opinions suggests that we believed that if the prisoners could have established a violation of Article IV(e), they would have been entitled to habeas relief. *See Williams*, 615 F.2d at 590 n. 4; *Esola*, 520 F.2d at 839.

10. In Nash v. Jeffes, 739 F.2d 878 (3d Cir.1984), *rev'd sub nom* Carchman v. Nash, 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985), we affirmed the district court's grant of habeas relief because Jeffes was not tried on a probationary

violation charge within 180 days after his request for disposition, which we construed as running from the probation department's letter informing Nash that a hearing would be held. Encompassed in our holding is our acknowledgement that a violation of the 180 day rule of Article III is cognizable in a federal habeas action. In *Nash*, however, we did not discuss, much less hold, that any violation of the 180 day rule automatically requires habeas relief. Instead the opinion was limited to the two questions carefully defined in the first paragraph of the opinion: (1) whether the IAD applies to a detainer based on a charge that a prisoner vio-

particularly significant that in both *Williams* and *Esola,* the claimed IADA violation was the failure of the receiving state to try the prisoner before returning him to the custody of the sending jurisdiction. In *Shack v. Attorney General of Pennsylvania,* 776 F.2d 1170, 1173 (3d Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1234, 89 L.Ed.2d 3 (1986), we construed *Williams* and *Esola* as holding that transfer and return without trial is a fundamental defect.

Of course we recognize that in *Williams,* one of the reasons given for the holding that a violation of IADA Article IV(e) is a fundamental defect was Congress' provision of the remedy of automatic dismissal of the charge with prejudice. Based on that language the court in *Shack* held that a state's failure to provide a prisoner with a pre-transfer extradition hearing as required by IAD Article IV(d) did not constitute a fundamental defect warranting habeas relief since the IAD provided no comparable sanction for that violation. 776 F.2d at 1173.

Concededly, the IAD also provides the remedy of dismissal with prejudice as the sanction for a trial that is untimely under Article III or Article IV. *See* note 8 *supra.* If we believed that under our controlling precedent, the sanction alone elevates such untimeliness, irrespective of how short the delay, to a fundamental defect for which habeas relief is mandated, we would be obliged to suggest that this matter be reconsidered by the in banc court. We believe, however, that the mandatory sanction of dismissal was just one of the factors that led the *Williams* court to its decision. More significant, we believe, was the court's concern about the effect of shuttling a prisoner. We stated, "The basic goal of the Act is to prevent transfer back and forth between competing jurisdictions, its theory being that such transfers under-

mine the right to a speedy trial and the rehabilitative process of the system in which the prisoner is currently serving a sentence." *Williams,* 615 F.2d at 588. We cannot view a violation of the anti-shuttling provision, which involves the removal of the prisoner from one jurisdiction, transfer, and return without trial, as comparable to the inception of a trial several weeks after required, particularly when the 120 day and 180 day provisions of the IAD themselves allow for an extension of the time for good cause. *See* Articles III(a), IV(c).

Thus, we are free to consider whether delay in a state trial for less than a month beyond the 180 day limit, which is all the prisoner alleges in his application for habeas corpus, is such a fundamental defect that a federal court is required to grant a writ of habeas corpus releasing the prisoner. We believe that such a holding would be counter to the principles enunciated by the Supreme Court in *Davis. See Kerr v. Finkbeiner,* 757 F.2d 604, 607 (4th Cir. 1985), *cert. denied,* 474 U.S. 929, 106 S.Ct. 263, 88 L.Ed.2d 269 (1985) (violation of the 180–day time provision of Article III(a) does not constitute a fundamental defect entitling a prisoner to relief under § 2254 absent a showing of prejudice arising out of the alleged violation).

Although the IAD itself provides strict sanctions for noncompliance with its mandated time schedules and a federal court applying the IADA would be obliged to impose those sanctions in a federal criminal proceeding, we believe that our function as a habeas court is not to act as an appeal court for minor violations of the statute by state authorities. Such action would trivialize the habeas corpus writ. It is significant that Casper did not allege that the claimed IAD violation prejudiced his ability to defend at trial or the circumstances of his incarceration.

---

lated his probation and (2) whether the requesting state had forfeited its right to insist on compliance with the standard procedures for requesting disposition on the charge by its action in that case. *Id.* at 879. Our holding on the first question that the IAD applies to a detainer based on a charge that a prisoner vio-

lated his probation was reversed by the Supreme Court. Because the delay in trying Nash on the probation charges was close to two years, we do not read that opinion, to the extent that it survives the Supreme Court's reversal, as holding that every violation of the 180 rule warrants habeas relief.

■ We therefore hold as one basis for our decision affirming the district court's refusal to grant a writ of habeas corpus that on the amplified record before us, Pennsylvania's failure to try Casper on the charges until October 6, 1981, which was more than 180 days after the date of March 12, 1981 when the District Attorney's office received Casper's letter, does not constitute a fundamental defect warranting the grant of habeas corpus relief.

## III.

### *Conformance of Plaintiff's Request*

As an alternative basis for affirming the district court's order, the District Attorney contends that Casper's letter did not satisfy the requirements of Article III and thus did not start the 180 days running. He bases his argument of nonconformance on Casper's failure to include a Form 3 certificate from the appropriate custodial official which must include the full information required by statute, such as the length of time served, good time, and parole eligibility. The District Attorney argues that the 180 days did not begin to run until June 4, 1981, when it received Forms 2, 3, and 4; since Casper's trial began 124 days after receipt of the forms, it met the 180 day requirement of Article III.

The Pennsylvania Superior Court "assum[ed] *arguendo*" that the letter written on February 27, 1981 and received on March 12, 1981 met all the requirements of the IAD. App. at 31. Were we obliged to defer to the Superior Court's conclusion that Casper had withdrawn his only effective request to return to Pennsylvania, App. at 31–32, we would also be able to avoid deciding whether Casper's letter constituted an adequate request for disposition under Article III.

■ We must give the Superior Court's findings of fact a presumption of correctness unless we determine that they are not fairly supported by the record. 28 U.S.C. § 2254(d)(8); *Sumner v. Mata*, 449 U.S. 539, 545–49, 101 S.Ct. 764, 768–70, 66 L.Ed.2d 722 (1981). The district court concluded, "there is reason to doubt the accuracy of the Superior Court's assessment" concerning whether Casper withdrew his request to return to Pennsylvania. App. at 184. We agree. The Superior Court relied on two items, one of which was Lawson's letter of April 16, 1981 stating that Casper refused to sign the form. In view of the fact the Form 2 signed by Casper requesting return to Montgomery County is dated March 27, 1981, App. at 128, and nothing in the record indicates that Casper signed it on a different date,[11] the April 16 letter provides inadequate support for the Superior Court's conclusion.

■ The other basis referred to by the Superior Court, Casper's testimony at a Philadelphia hearing relating to a sentence on a charge different than the matter before us, was quoted somewhat out of context. The Superior Court quoted Casper's testimony as follows:

> The Defendant: Just listen to me, your honor ... What I did is *I was pushed to come to Philadelphia* on the grounds that I could come back here and get help and stuff in the beginning before anything happened.

App. at 32 (emphasis added by Superior Court). As quoted, it suggests Casper was

---

11. We note that Casper also signed Form 4, which is dated March 24, 1981. *See* App. at 127. A subsequent letter sent by Lawson to Casper dated March 3, 1986, after the institution of this litigation, shows that Lawson had no personal knowledge that Casper withdrew his request for transfer, and confirms that Casper was still requesting return to Pennsylvania about the same time Lawson wrote the letter stating that Casper did not want to return. Lawson's letter states:

> In my letter to Mr. DiBenedetto on April 16, 1981, I informed him that you had refused to sign Form # 2 from Montgomery County as

you indicated that you were not interested in being transported at that time. My information was obtained from Mr. Fortner, who was your Classification Supervisor. However, a memo, date stamped April 27, 1981, was received with copies of Forms 2, 3, and 4, signed by you. The date of March 27, 1981 was typed on Form # 2, assuming that this was the date or sometimes thereabouts you did indeed sign it.

App. at 133. This letter was written subsequent to the decision of the Pennsylvania Superior Court.

unwilling to return voluntarily. The complete testimony was:

> Just listen to me, your Honor; I tried committing suicide a few times. I have had that feeling. What I did is I was pushed for the petition to come back here in Florida before Philadelphia on the grounds that I could come back here and get help and stuff in the beginning before anything happened. I want to get everything out of my way. I want to do it with all the cases I have, but I am scared.

App. at 141. The full quotation suggests Casper also had a desire to resolve all pending cases. In light of Casper's many uncontradicted attempts to initiate his return, we are unable to say after "review[ing] the record as a whole," that the Superior Court's conclusion that Casper withdrew the February 27 letter is "fairly supported by the record." 28 U.S.C. § 2254(d)(8).

We must determine, therefore, whether Casper's February 27, 1981 letter was an effective request under Article III of the IAD. Neither the Superior Court nor the district court made conclusive findings on this issue. Casper's letter stated:

> I recently received notice from my classification officer that I have a detainer placed against me from your jurisdiction. I am presently incarcerated with the Florida Department of Corrections for a five year sentence. I have charge No's M.C. 8005–3179 Burglary, C.P. 8005–1686 Attempted Burglary, C.P. 8003–1330 Burglary pending in your jurisdiction. I wish to dispose of these and any and all other charges, if any, as fast and easily as possible. Please consider this my formal request for a fast and speedy trial in these matters. I also waive extradition at this time. Thank you for your time and consideration in this matter.

App. at 124. Neither the certificate from the Florida officials nor any information other than the length of Casper's sentence was provided by Casper at this time.

In the portion of our opinion in *Nash v. Jeffes*, 739 F.2d 878 (3d Cir.1984), *rev'd sub nom., Carchman v. Nash,* 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985), that was not the subject of the Supreme Court's reversal, and which therefore remains binding on us, *see* 1B J. Moore, Moore's Federal Practice ¶ 0.402[2] at 25–26 nn. 2–3 (2d ed. 1984), we noted that "courts have generally required that prisoners must strictly comply with IAD procedures before they will dismiss charges on the basis of a violation of [the 180–day provision of] Article III." 739 F.2d at 884; *see also Williams v. Maryland,* 445 F.Supp. 1216, 1220 (D.Md.1978) (letter to state district court requesting trial on state charge did not satisfy the requirements of Article III); *Gray v. Benson,* 443 F.Supp. 1284, 1986 (D.Kan.1978) (letter to U.S. Attorney requesting disposition of detainer which did not include the necessary certificate and was not delivered to the appropriate court was not sufficient to trigger Article III of the Act); *Beebe v. Vaughn,* 430 F.Supp. 1220, 1223–24 (D.Del. 1977) (letter addressed to court clerk informing court of inmate's incarceration and providing "notification to the court for a fast and speedy trial" did not satisfy the requirements of the IADA since letter did not inform officials that IADA was being invoked and little information was given about inmate's current term of incarceration). *But see Franks v. Johnson,* 401 F.Supp. 669, 672 (E.D.Mich.1975) (quashing detainer where receiving state knew of prisoner's whereabouts and prisoner communicated with receiving state authorities requesting a speedy trial and final disposition even though prisoner refused to waive extradition).

There are persuasive reasons for requiring a prisoner to comply with the procedures required by Article III(a) as a predicate for invoking Article V(c)'s severe sanction of dismissal with prejudice. If a prisoner uses what is now the standardized Form 2 request form, *see* note 2 *supra,* and includes the certificate mandated by Article III(a), the receiving jurisdiction will be on notice that Article III has been invoked. As we stated in *Nash,* "the prosecuting authorities cannot be expected to analyze each communication from a prisoner with a fine-tooth comb to determine

whether it should be construed as invoking the IAD." *Nash v. Jeffes,* 739 F.2d at 884. An interpretation that imposes the risk on the district attorney's office that Article III would be satisfied by an ambiguous letter from a prisoner which contains an insignificant portion of the information required to be provided could create "a trap for unwary prosecuting officials" and could defeat the underlying purpose of Article III's procedural requirements which provide a "systematic method of rapidly adjudicating charges against prisoners held in another jurisdiction." *Id.* A prisoner's compliance with the statutory requirements will not only assist the prosecutor in identifying Article III IAD requests but will also enable the prosecutor to make a decision whether to prosecute in the requesting state. For example, the state might choose not to prosecute after learning from the information supplied in the certificate that the prisoner is already serving a lengthy sentence elsewhere on a more serious charge. *See Beebe v. Vaughn,* 430 F.Supp. at 1223 n. 6.

Casper argues that his letter must be considered an effective Article III demand because of our decision in *Nash v. Jeffes.* We believe *Nash* is distinguishable. Our conclusion in *Nash* that the prisoner had satisfied the requirements of Article III was not based on the contents of his letters to New Jersey, which could be considered comparable to Casper's letter in this case, but on the fact that a letter from the New Jersey probation department informing Nash that a hearing would be held as soon as an attorney could be appointed for him "constituted an acknowledgement on the part of New Jersey that Nash's letters were being treated as a request for disposition" of the charges against him. *Nash,* 739 F.2d at 885. We stated, "On the basis of that letter, Nash was justified in taking no further action when, two weeks later, the Pennsylvania authorities provided him with a 'detainer procedure notice.' " *Id.*

We held that New Jersey, rather than Nash, should bear the responsibility for the delay.[12]

In this case, there is no basis for charging Pennsylvania with the responsibility for the delay in securing Casper's return. Unlike New Jersey in *Nash,* Pennsylvania sent Casper no communication upon which he arguably relied in delaying further action.

■ Strict compliance with Article III may not be required when the prisoner has done everything possible, and it is the custodial state that is responsible for the default. *See, e.g., Schofs v. Warden, FCI, Lexington,* 509 F.Supp. 78, 82 (E.D.Ky. 1981) (letters to clerk and state's attorney requesting final disposition of charge against him written by federal prisoner who was denied the necessary forms through no fault of his own satisfied the requirements of Article III). Florida's delay in sending the forms prepared by its custodial officials and signed by Casper months earlier cannot reasonably be charged to Casper. Nor do we deem it decisive that Casper failed to send his letter by registered or certified mail, return receipt requested, which Article III(b) requires to be used by the custodial official when forwarding the prisoner's request and the Form 3 certificate. That provision is designed to insure that the request is received. Casper's request, despite its inadequate addressee designation, was in fact received by the appropriate Pennsylvania officials.

■ A prisoner who seeks to rely on the default of the custodial state to excuse his or her failure to satisfy the procedural requirements of the IAD must nonetheless show that s/he substantially complied to the extent possible. In this case, Form 1, which Casper received February 25, 1981 and which precipitated his letter to Philadelphia, advised him that he must include the necessary certificate of the custodial authority with his request for prompt dis-

---

12. Similarly, in United States v. Mauro, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), the prisoner was already in the custody of the receiving jurisdiction. Accordingly, the Court held, *inter alia,* that his persistent requests for a speedy trial were sufficient to invoke the provi-

sion of Article IV(c) requiring that a prisoner returned to a jurisdiction at its request be tried within 120-days of his return, notwithstanding the prisoner's failure to specifically invoke the IADA. *Id.* at 364–65, 98 S.Ct. at 1849.

**1294**

position of outstanding charges. He did not do so. Even more important, his letter dated February 27, 1981 cannot be deemed an adequate substitute for the required certificate since it does not contain substantially all the information which Article III requires must be included and which the receiving state is entitled to have before the 180 day clock begins to run. Because Casper's letter was not in substantial conformance with Article III(a), there was no violation of that provision's 180 day requirement. The only effective notice of Casper's request for full disposition of the Pennsylvania charges against him was received by the Philadelphia authorities on June 4, 1981. Casper's trial began on October 6, 1981, well within the required 180 days.

### IV.

In summary we have held that Casper's allegation that the IAD was violated by the failure to try him within 180 days of his request raised a claim cognizable in a proceeding under 28 U.S.C. § 2254, but that the district court did not err in holding that the short delay did not warrant grant of a writ of habeas corpus. Moving beyond the question of the availability of collateral attack under § 2254 for a nonprejudicial failure to comply with the formal requirements of the IAD, we have also been able, because of the facts of record present here for review, to determine, as an alternative basis for our affirmance of the judgment on appeal, that Casper's letter received by the District Attorney's office on March 12, 1981 was not sufficient to invoke Article III of the IAD. This is so not only because Casper failed to include the required certificate but also because Casper's letter was not in substantial conformity with the requirements of Article III(a).

For the foregoing reasons, we will affirm the judgment of the district court.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, concurring.

I agree with the result of the majority and join only in Part III of the opinion.