

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-6-1998

# United States v. Dent

Precedential or Non-Precedential:

Docket 97-1666

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Dent" (1998). *1998 Decisions.* Paper 149.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/149

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 6, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1666

UNITED STATES OF AMERICA

v.

MICHAEL DENT,

Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Criminal No. 92-cr-00223-3)

Argued on October 28, 1997

BEFORE: SLOVITER, NYGAARD, and KRAVITCH,*
Circuit Judges.

(Filed July 6, 1998)

       Anna M. Durbin (Argued)
       Law Office of Peter Goldberger
       50 Rittenhouse Place
       Ardmore, PA 19003-2276

        Attorney for Appellant

_____

* Honorable Phyllis A. Kravitch, Senior Circuit Judge for the United
States Court of Appeals for the Eleventh Circuit, sitting by designation.

Alan J. Chaset
Law Offices of Alan J. Chaset
910 King Street, Suite 200
Alexandria, VA 22314

Attorney for Amicus-Appellant
Families Against Mandatory
Minimums Foundation

Zane D. Memeger (Argued)
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Attorney for Appellee

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Michael Dent appeals his conviction for conspiracy to distribute crack cocaine in violation of 21 U.S.C. S 841(b), alleging that both his conviction and sentence rest on legally insufficient evidence. Dent also argues that the prosecution's delay in bringing his case to trial violated the Sixth Amendment and the Interstate Agreement on Detainers Act, and that the district court should have permitted him to review the personnel file of his arresting officer. We will affirm.

I.

Dent's case has a long and dramatic history, which need be recounted only briefly for purposes of this appeal. On January 19, 1992, Philadelphia police officers Stephen Cassidy and Dathon Enoch pursued a suspected drug dealer into a local residence. Inside they found Dent and two other men seated at a table cluttered with cocaine base and drug paraphernalia. The officers arrested Dent and his companions, as well as the suspected drug dealer who led them to the house. The federal prosecutor took over Dent's case from the Philadelphia authorities, but Dent jumped bond and fled the jurisdiction before federal agents could

arrest him. Because of Dent's fugitive status, delay on the government's part and Dent's intervening incarceration in New York state for unrelated crimes, he was not tried on federal narcotics charges until February 1997, although a grand jury indicted him on April 22, 1992. A jury convicted Dent of one count of conspiracy to distribute crack cocaine, but acquitted him of a related count for possession of a controlled substance. As punishment, he now faces 92 months' imprisonment to be followed by a five-year period of supervised release.

Dent's appeal raises numerous challenges to his conviction and sentence. First, he alleges that the government's delay in bringing his case to trial violated the Sixth Amendment's speedy trial provision and the Interstate Agreement on Detainers Act ("IAD"), 18 U.S.C. app. S 2. Second, he claims that Officer Cassidy's testimony was insufficient to prove his participation in a conspiracy to distribute crack because the officer could not recall seeing Dent personally handle any drugs or drug paraphernalia. Next, Dent alleges that the district court should not have admitted the cocaine base at trial, since the government failed to establish a reliable chain of custody for the exhibit. He further argues that the government did not demonstrate that the drugs were crack rather than another form of cocaine base, and that consequently he may not be sentenced under U.S. Sentencing Guidelines Manual ("U.S.S.G.") S 2D1.1, which imposes a far harsher penalty for crack offenses than is applied to crimes involving equal quantities of cocaine in other forms. Dent also insists that the district court should have permitted him to review Cassidy's personnel file, and that had it done so, he could have cast doubt on the officer's credibility as a witness. Finally, Dent attacks his sentence on the ground that the government used an unreliable method to determine the amount of crack involved in his crime. We will consider each of these arguments in turn.

The district court had jurisdiction under 18 U.S.C. S 3231. We have appellate jurisdiction over the district court's order under 28 U.S.C. S 1291 and over the final sentence under 18 U.S.C. S 3742(a).

3

II.

We consider first Dent's contention that a prejudicial pre-trial delay violated both his Sixth Amendment right to a speedy trial and the IAD. We review the district court's legal conclusions de novo, but will reverse factual findings only if they are clearly erroneous. See United States v. Bierley, 922 F.2d 1061, 1064 (3d Cir. 1990).

A.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. However, "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors" relevant to whether a pre-trial delay prejudiced the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972). Here, the approximately five-year delay between Dent's arrest and his trial is sufficiently lengthy to trigger full inquiry into the possibility that Dent suffered prejudice as a result. See Doggett v. United States, 505 U.S. 647, 651 n.1, 658 (1992) (observing that most courts find a postaccusation delay "presumptively prejudicial" at least as it approaches one year); Hakeem v. Beyer, 990 F.2d 750, 760 (3d Cir. 1993) (fourteen and one-half month delay warrants full inquiry into possible prejudice resulting from postponement of trial).

Once the defendant identifies a presumptively prejudicial delay in bringing his case to trial, determining whether that delay violated the Sixth Amendment requires a highly fact-specific analysis that balances all the relevant circumstances. In conducting this balancing test, the Supreme Court has emphasized four factors: (1) the length of the delay, (2) the reasons for delay, (3) whether, in due course, the defendant asserted his right to a speedy trial and (4) the actual prejudice the defendant suffered as a result. See Barker, 407 U.S. at 530. Although we begin our analysis with these four factors, we are mindful that none is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial," and that we must consider them together "with such other circumstances as may be relevant." Id.

4

Although the first of the Barker factors, the length of the delay, weighs somewhat in Dent's favor, it is not compelling. Certainly the gap between Dent's January 19, 1992 arrest and his trial on February 3 and 4, 1997 is substantial. However, the seriousness of a postaccusation delay varies depending on the circumstances, and a waiting period during which the defendant is not detained presents fewer concerns than a wait accompanied by pretrial incarceration. See id. at 533 (noting serious societal disadvantages caused by pretrial incarceration). Dent did not endure any significant pretrial detention associated with the conviction from which he appeals. We therefore do not find the length of the pretrial delay in his case to be intolerable.

More important, Dent's claim stumbles on the second Barker factor, which requires us to consider whether Dent or the government caused the delay. Although both parties contributed to the post-indictment delay, it is clear that Dent bears the bulk of responsibility in this regard. After his arrest, Dent jumped bond and remained a fugitive for more than two years. He was listed as a wanted person on April 30, 1992 after failing to appear at a state court hearing, and, despite diligent efforts, federal agents could not locate him until August 1994. Dent argues that he is not to blame for this part of the delay, because federal agents had not yet arrested him when he fled, and thus he did not know of the federal indictment. This argument is specious. Dent may not have known that his case had been adopted by federal prosecutors, but he certainly knew that he had been arrested by Philadelphia police and released on bond, and that proceedings had commenced against him in state court. As a result, Dent was fully aware of his fugitive status when he fled to New York sometime in early 1992.

Inexplicably, after learning that Dent was incarcerated in New York, the government waited fourteen months before taking further steps to bring him to justice. Beginning October 17, 1995, however, the prosecution consistently sought to have Dent tried in Pennsylvania. On that date, prosecutors wrote to the U.S. Marshal Service requesting that Dent's arrest warrant be lodged as a detainer with the

5

correctional facility where Dent purportedly was incarcerated, only to learn that no inmate named Michael Dent was then in residence at that institution. This confusion was not resolved until April 1996, when the government discovered that Dent was being held at a different New York correctional institution under his real name, Isaac Dennis. On April 26, 1996, the government again wrote to the U.S. Marshal Service requesting that Dent's outstanding federal arrest warrant be lodged as a detainer, this time with the correct New York facility.

Thus, Dent is wholly responsible for the first 26 months of the pre-trial delay, and the government is to blame for only 14 months of that delay. Although an additional 13 months passed before Dent's trial, the government cannot be faulted for this lag. By all accounts, the United States Attorney's office sedulously attempted to locate Dent in the New York penal system after October 17, 1995. Indeed, it was Dent's use of an alias, not any neglect on the government's part, which largely caused the additional delay.

The third Barker criterion--whether the defendant timely asserted the right to a speedy trial--also weighs against Dent's Sixth Amendment claim. Dent did not assert his right to a speedy trial until June 1996, more than four years after his arrest. Although Dent was unaware of the federal indictment until that date, he certainly knew that narcotics charges were pending against him in Philadelphia in connection with his prior arrest, and that he had left Pennsylvania just as criminal proceedings against him were beginning. Had Dent truly wished to expedite his trial, he would have remained in Pennsylvania to be tried, or at the very least maintained contact with authorities in that state. Moreover, he would not have given arresting officers an assumed name or allowed the state court to begin proceedings against him using the alias.

The fourth element under Barker, prejudice to the accused, likewise does not indicate a violation of Dent's Sixth Amendment rights. Dent contends that the pretrial delay prejudiced his defense because witnesses could no longer remember important details. Further, Officer Enoch retired before Dent's trial and thus allegedly could not be

6

located to testify for the defense. Dent also claims that his mother, his stepfather and a codefendant, William Scott, all died before the trial and therefore could not testify in his defense. In addition, Dent alleges prejudice because he lost the opportunity to serve his present sentence concurrently with his incarceration in New York.

None of these allegations of prejudice is convincing. First, the passage of time probably helped Dent's case by making Sergeant Cassidy's testimony less detailed and therefore less convincing. Indeed, one of Dent's principal arguments at trial was that Cassidy could not recollect seeing Dent personally handle any drugs or drug paraphernalia. Second, there is no reason to believe that Officer Enoch's testimony would have aided the defense. Moreover, Dent has not shown that he seriously attempted to locate Enoch for trial. Nor is it likely that William Scott could have offered any useful information not provided by Dent himself, because at all relevant times Scott and Dent were seated side-by-side at the crime scene and thus had the same opportunity to witness events. Finally, Dent's parents could not have provided a credible alibi, because Cassidy saw Dent at the crime scene and arrested him there. In any event, Dent's mother died in 1993, during the period of the delay attributable wholly to Dent's flight from the law. Thus Dent, not the government, should bear the burden of any loss of evidence caused by her unavailability.

Of course, "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove nor, for that matter, identify." Doggett, 505 U.S. at 655. Thus "affirmative proof of particularized prejudice is not essential to every speedy trial claim." Id. On the other hand, however, this presumptive prejudice certainly "cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria." Id. Here, the presumptive prejudice from the government's fourteen month delay simply cannot outweigh the other Barker factors, which do not support a conclusion that Dent suffered prejudice from denial of a speedy trial. Accordingly, and because we find no other circumstances relevant to this analysis, we hold that the lag between Dent's arrest and trial did not violate the Sixth Amendment.

7

B.

The IAD, which governs resolution of outstanding criminal charges against suspects serving sentences in other states, also fails to provide Dent a basis for relief. Under Article III(a) of the IAD, a defendant must be tried on outstanding criminal charges within 180 days after authorities receive his or her request for trial. See 18 U.S.C. app. S 2, art. III(a); Casper v. Ryan, 822 F.2d 1283, 1285 (3d Cir. 1987). Furthermore, Article V(c) of the IAD requires that an indictment be dismissed with prejudice if trial is not commenced within that period. 18 U.S.C. app.S 2, art. V(c).

On April 26, 1996, after finally locating Dent at Mid-State Correctional Facility ("Mid-State"), the United States Attorney initiated proceedings to secure Dent's return to Pennsylvania for trial under Article IV(a) of the IAD. That Article permits a prosecutor outside the jurisdiction where an inmate is incarcerated to lodge a detainer against the prisoner and procure his presence for trial on pending criminal charges. Meanwhile, on June 25, 1996, Dent sent a letter to the federal district court for the Eastern District of Pennsylvania requesting a speedy resolution of his outstanding federal charges under the Interstate Agreement on Detainers. His letter did not reference Article III, however, and did not include the information which that Article states must accompany such a request.

Dent claims that because the government received his letter requesting a speedy trial on July 23, 1996, Article III required the prosecution to initiate his trial on or before January 19, 1997. However, invocation of Article III's 180-day time limit generally requires strict compliance with the Article's requirements. Nash v. Jeffes, 739 F.2d 878, 884 (3d Cir. 1984), rev'd on other grounds sub. nom., Carchman v. Nash, 473 U.S. 716 (1985). Thus the 180-day period does not begin until the inmate "shall have caused to be delivered to the prosecuting officer and the appropriate court . . . written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint." Article III(a). Additionally, the request "shall be accompanied by a certificate of the appropriate official having custody of the

8

prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decision of the State parole agency relating to the prisoner." Id. Because Dent failed to satisfy these essential procedural requirements, we hold that his June 25, 1996 letter did not start the clock for the government's compliance with Article III. Instead, the 180-day period began to run August 22, 1996 when the prosecution learned that Dent wished to proceed under IAD Article III, and did not expire until February 18, 1997, well after Dent's trial.

Dent argues that the circumstances of his case require us to excuse his noncompliance with Article III. He points out that his June 25, 1996 letter invoked the IAD, the government already possessed most of the necessary information concerning his case and his noncompliance was solely the fault of the New York state penal authorities. Dent repeatedly asked authorities at Mid-State to provide him with IAD forms so that he might resolve the federal charges pending against him in Pennsylvania. Yet instead of supplying the necessary forms, the authorities erroneously informed him that federal warrants "do not fall under the IAD," because it "is solely an agreement between states." They further advised Dent that he could expedite his trial by writing the United States District Court for the Eastern District of Pennsylvania, but that he need "not fill out any papers." In doing so, the New York officials failed to satisfy Article III(c)'s mandate that"[t]he warden, commissioner of corrections, or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information, or complaint on which the detainer is based." 18 U.S.C. app. S 2, art. III(c).

In Casper, 822 F.2d at 1293, we recognized that "[s]trict compliance with Article III may not be required when the prisoner has done everything possible, and it is the custodial state that is responsible for the default." We also explained, however, that an inmate seeking the benefit of

this exception nonetheless must "show that s/he substantially complied to the extent possible." Id. Dent's letter did not include his term of commitment, the time already served, the time remaining to be served on his sentence, or any information concerning good-time credits or parole eligibility as required under Article III. Nor does he claim that he could not have supplied these details. Instead, Dent notes that when the government received his letter on July 23, 1996, it had already obtained most of the necessary information through its own efforts to secure custody of Dent under Article IV.[1] This fact is not dispositive. As we emphasized in Casper, the inmate's IAD request must contain sufficient information to alert the government that Article III has been invoked, without requiring the prosecution "to analyze each communication . . . with a fine-tooth comb to determine whether it should be construed as invoking the IAD." Nash, 739 F.2d at 884. Under the circumstances, Dent's letter simply was inadequate to alert the government that he sought to rely on Article III. To hold otherwise would "create`a trap for unwary prosecuting officials' and . . . defeat the underlying purpose of Article III's procedural requirements. . . ." Casper, 822 F.2d at 1292-93 (quoting Nash , 739 F.2d at 884).

III.

We will review together Dent's various challenges to the sufficiency of evidence supporting his conviction. We apply a particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence. "It is not for us to weigh the evidence or to determine the credibility of the witnesses." United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir.), cert. denied, ___ U.S. ___, 117 S. Ct. 623 (1996) (citation omitted). Rather, we must view the evidence in the light most favorable to the government, see United States v. Thomas, 114 F.3d 403, 405 (3d Cir. 1997), and will sustain the verdict if " `any rational trier of fact

_____

1. Dent claims that as of July 23, 1996, the government had all of the information that Article III(a) requires him to supply, with the exception of details regarding good-time credits. See Appellant's Reply Br. at 8.

could have found the essential elements of the crime beyond a reasonable doubt.' " Voigt, 89 F.3d at 1080 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Accord United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987). Thus, "a claim of insufficiency of the evidence places a very heavy burden on an appellant." United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990) (citation omitted).

The evidence against Dent consisted of testimony by Dent's arresting officer, statements of a forensic scientist who examined the drugs seized during Dent's arrest and the cocaine itself. Dent insists that none of this suffices to prove beyond a reasonable doubt that he participated in a conspiracy to distribute crack. We disagree.

A.

Testimony from Dent's arresting officer, Sergeant Cassidy, provided the prosecution's principal evidence at trial. On the witness stand, Cassidy recounted the following events. While patrolling Sharswood Avenue in Philadelphia, he and Officer Dathon Enoch observed two men exchanging money for several small, unidentified objects. When Cassidy and Enoch approached, both men fled. Although the man who received the objects escaped, the other, later identified as Courtney Golden, entered 5411 Sharswood Avenue and attempted to close the door of the residence to prevent the officers from following him inside. The three men struggled for a moment in a tug-of-war, as Golden sought to keep the door shut, while Enoch and Cassidy tried to enter. Golden eventually abandoned his hold on the door, fleeing to the rear of the house and into the kitchen. Cassidy and Enoch pursued Golden into the kitchen where, in Cassidy's words, they

> observed three males sitting at a table inside the kitchen area with numerous drug items on the table. There was a plate, there was a chunk of a -- an off-white chunky substance. There were razor blades, straw. There were vials, some were full. There were vials in bags that were wrapped up and lined out . .. in a straight line . . . about four or five of them.

11

Cassidy observed that "one of [the men] had a razor blade in his hand," and based on his fifteen years of experience investigating narcotics offenses, he concluded that the three men seated at the table, one of whom was Dent, were "bagging cocaine" for sale. Finally, Cassidy stated that Courtney Golden had cocaine in his coat pocket.

In addition, Tanweer Ali, a forensic scientist from the Philadelphia Police Drug Laboratory, testified that she identified the substance seized from Dent as cocaine base by performing two tests: (1) a Scott's reagent test, which yielded positive results consistent with the presence of cocaine base, and (2) a gas chromatograph ion test, which also indicated the presence of cocaine. Ali also testified that the Scott Test is 99.9 percent accurate.

We find this evidence sufficient to support a reasonable inference that Dent and his co-defendants conspired to distribute cocaine base. A conviction for conspiracy requires proof of "unity of purpose, the intent to achieve a common goal, and an agreement to work together toward that goal." United States v. Powell, 113 F.3d 464, 467 (3d Cir. 1997). The government must prove each element beyond a reasonable doubt, but may do so solely by circumstantial evidence. See United States v. Barrow, 363 F.2d 62, 64 (3d Cir. 1966). A reasonable jury could infer from Dent's proximity to the drugs and paraphernalia, while at least one of the men seated beside him bagged the crack, that Dent and the other men conspired to distribute cocaine. See United States v. James, 40 F.3d 850, 867 (7th Cir. 1994), vacated on other grounds sub nom., James v. United States, 516 U.S. 1022 (1995), modified on other grounds, 79 F.3d 553 (7th Cir. 1996) (defendant's presence, proximity and apparent participation during packaging of drugs for street sale sufficed to sustain conviction for drug distribution conspiracy, although arresting officer did not actually see defendant handle cocaine). A jury also reasonably could infer from Golden's actions outside the house, his flight into 5411 Sharswood Avenue and the presence of cocaine in his pockets that Golden had sold drugs as part of a conspiracy in which Dent participated. Dent's contention that the evidence also permits a less sinister conclusion is immaterial. "To sustain the jury's

12

verdict, the evidence does not need to be inconsistent with every conclusion save that of guilt." United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990) (citation and internal quotation marks omitted).

Dent's reliance on Thomas, supra, and United States v. Wexler, 838 F.2d 88 (3d Cir. 1988), is also misplaced. In those cases, we explained that a conviction for conspiracy to distribute a controlled substance requires evidence that the accused knew the conspiracy's purpose was to distribute contraband. See Thomas, 114 F.3d at 406 (insufficient evidence that defendant participated in drug conspiracy absent proof that he knew the suitcase at issue contained drugs); Wexler, 838 F.2d at 92 (evidence insufficient to support drug conspiracy conviction absent proof that defendant who acted as a lookout knew he was facilitating hashish distribution). In contrast to Thomas and Wexler, here the evidence clearly supports the conclusion that Dent knew his accomplices intended to distribute cocaine base because he watched them package the drugs for sale.

B.

Dent also claims that the cocaine base was inadmissible under Federal Rule of Evidence 901, because the government failed to provide a reliable chain of custody. To establish a chain of custody, the government need only show that it took reasonable precautions to preserve the evidence in its original condition, even if all possibilities of tampering are not excluded. See United States v. Kelly, 14 F.3d 1169, 1175 (7th Cir. 1994). Absent actual evidence of tampering, a trial court may presume regularity in public officials' handling of contraband. See Kelly, 14 F.3d at 1175; United States v. Jackson, 649 F.2d 967, 973-74 (3d Cir.), cert. denied, 454 U.S. 871 (1981). Unless the trial court clearly abused its discretion, we must uphold its decision to admit the cocaine base into evidence. See Jackson, 649 F.2d at 973.

Here, Cassidy testified that he transported the drugs directly from the crime scene to the Narcotics Division and observed while laboratory personnel field tested the drugs

13

and assigned them an inventory number. Cassidy's testimony also clearly distinguished the drugs seized from codefendant Courtney Golden from those found on the table where Dent was seated at the time of his arrest. Thus, Dent's contention that police commingled the evidence with drugs taken from other defendants is insupportable. Moreover, the prosecution showed that the cocaine attributed to Dent remained in a locked storage bin and was removed only for laboratory testing and for presentation in court. At all times, the laboratory maintained a written record showing who handled the contraband and when. Although Dent identifies a few instances when the evidence was placed in a different storage bin without the change being entered into the record log, these discrepancies affect the weight of the evidence, not its admissibility. Moreover, it is clear that the drugs never left the lab except when transported for proceedings against Dent's co-conspirators.

Nor is the evidence inadmissible because of a tear in the plastic bag holding the vials of cocaine base. The chemist testified that this tear could have resulted from handling or temperature exposure. Thus, without more, it is insufficient to require exclusion of the evidence. The chemist also stated that when she tested and weighed the drugs, the bag contained no tears.

Finally, we do not place great significance on variations in the witnesses' descriptions of the cocaine. Cassidy's description of the contraband at trial as "an off white chunky substance" differs only slightly from that on the property receipt, which specifies "a white chunky substance wrapped in foil" and from Ali's statement that she tested "white chunky residue" on a foil-wrapped glass plate. These minor discrepancies can be attributed to the inevitable differences in human perception, and we will not require the police and laboratory chemists to use precisely the same words in referring to evidence before it may be admitted.

IV.

We turn next to Dent's claim that he should not have been sentenced under the crack enhancement provisions of

14

U.S.S.G. S 2D1.1, because the government failed to prove by a preponderance of the evidence that the substance recovered during Dent's arrest was crack cocaine. We review for clear error the district court's finding that the substance found in Dent's presence was crack, reversing only if we are left with a definite and firm conviction that a mistake has been made. See United States v. Roman, 121 F.3d 136, 140 (3d Cir. 1997); United States v. Covington, 133 F.3d 639, 643 (8th Cir. 1998).

The crack enhancement provisions of Sentencing Guidelines S 2D1.1 apply only if the prosecution proves by a preponderance of the evidence that the cocaine-base involved satisfies the Guidelines' definition of crack. See United States v. James, 78 F.3d 851, 858 (3d Cir.), cert. denied, 117 S. Ct. 128 (1996). That definition states that " `Cocaine base' for purposes of this guideline, means crack. `Crack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. S 2D1.1(c) (Note D) (1995).

In Dent's case, although a chemist identified the contraband as cocaine base, she did not perform a test to determine whether it contained sodium bicarbonate, which Dent claims would be present in crack. Therefore, the sole evidence that Dent conspired to distribute crack rather than another form of cocaine base was Sergeant Cassidy's statement that the vials in Item 5 contained crack and Ali's testimony that crack generally is sold in vials or plastic bags. Although police seized six items of evidence from Dent and his co-conspirators, the court sentenced Dent based only on Items 2, 3 and 5. Cassidy characterized these items as follows:

> Item number two is a clear glass plate with approximately three grams of white chunky substance, cocaine. Item number 3 is 17 clear plastic vials sealed with red caps containing a white substance, cocaine. . . . Item number 5 is five clear plastic sandwich bags containing 23 each clear plastic vials sealed with red caps containing a white substance, crack.

15

Thus Cassidy's testimony indicates only that Item 5 contained crack, rather than another form of cocaine base.

Ali testified that all of the items contained cocaine base and stated only that she "mostly . . . see[s] crack in vials and ziplock baggies, and it comes in hard, chunky substance form, as compared to cocaine salt that comes in chunky powdered form and that can also be packed in ziplock baggies or heat-sealed baggies or in sandwich bags [sic] kind bags." When asked more specifically about whether the cocaine base she tested was crack, Ali testified that she has "very little experience or no experience at all" in distinguishing between different forms of cocaine base, and that she could not say whether the substance was crack.

In Roman, 121 F.3d at 141, we held that precise chemical analysis is not necessary to prove that cocaine base is crack under the Sentencing Guidelines. There, the government had tested the cocaine base for traces of sodium bicarbonate, but found none. Id. The prosecution explained the absence of sodium bicarbonate by presenting evidence that if cocaine is cooked carefully, no sodium bicarbonate residue will remain in the finished crack. Id. Thus, the only evidence that the cocaine base was crack was the statement of a twelve-year veteran of the police force that it "was packaged in clear plastic vials with color caps, which is how crack is commonly packaged in the streets of Philadelphia." Id. (internal quotation marks omitted). Because the testifying officer had more than twelve years of experience with the Drug Enforcement Agency task force, had participated in more than 1000 cases involving crack cocaine, attended training sessions on cocaine conducted by the Philadelphia police chemical lab and instructed other narcotics officers about identifying crack, we found his testimony "just barely" sufficient to meet the preponderance of the evidence standard. Id.

As we stated in Roman, ideally the government should aspire to provide a higher quality of proof than offered here. Id. at 141 n.4. Nonetheless, we cannot conclude that the district court abused its discretion by finding that the testimony of Cassidy and Ali satisfied the prosecution's burden of proof. Cassidy worked for the police force slightly

16

longer than the officer in Roman, and although he only testified that Item 5 contained crack, that item weighed 5.803 grams and therefore suffices to support Dent's sentence. By her own admission, Ali has virtually no experience in distinguishing between crack and other forms of cocaine base. Thus, her testimony that the cocaine base taken from the table where Dent was seated was packaged using the method commonly used to pack crack for street sale has substantially less probative value than the statement of the investigating officer in Roman. Nonetheless, when combined with Officer Cassidy's testimony, it satisfies the government's burden of proof.

V.

We must also reject Dent's claim that the prosecution failed to prove the quantity of crack involved in his crime because it used an unreliable process to calculate the crack's weight. The drugs attributed to Dent were Item 2, a foil-wrapped lump of crack, and Items 3 and 5, both of which consisted of several vials of cocaine base. Tanweer Ali tested and weighed the single lump. She also individually weighed four of the seventeen vials from Item 3 and eleven of the 115 vials in Item 5. She then used the actual weights of these sample vials to extrapolate the weights of the vials in Items 3 and 115 respectively. Ali also testified that the substance in all of the vials had the same general appearance. We upheld this weighing procedure in United State v. McCutchen, 992 F.2d 22 (3d Cir. 1993). There, we concluded that "[i]f a defendant challenges a drug quantity estimate based on an extrapolation from a test sample, the government must show, and the court must find, that there is an adequate basis in fact for the extrapolation and that the quantity was determined in a manner consistent with accepted standards of reliability." Id. at 25-26. This standard does not require that the government produce statistical evidence supporting its sampling techniques. Id. at 26. "Rather, reasonable reliability is the touchstone of the determination." Id.

Here, the weight calculation was reasonably reliable because it was determined using an established procedure, the vials and their contents were substantially similar in

17

appearance, police seized all the drugs at the same time and place, and Ali randomly selected the vials weighed.2 See id.; United States v. Scalia, 993 F.2d 984, 989 (1st Cir. 1993) ("[S]ufficient indicia of reliability may be found where a preponderance of the evidence demonstrates that (1) a proper `random' selection procedure was employed; (2) the chemical testing method conformed with an accepted methodology; (3) the tested and untested samples were sufficiently similar in physical appearance; and (4) the tested and untested samples were contemporaneously seized at the search scene.").

VI.

Finally, we will affirm the district court's decision denying Dent's motion to subpoena Sergeant Cassidy's personnel files. Before trial, Dent's counsel allegedly learned that another drug case in which Cassidy was scheduled to testify had been dismissed amid allegations that Cassidy had committed misconduct in a drug investigation. Anticipating that Cassidy's personnel records could be used to impeach his credibility at trial, counsel sought to subpoena those records under Federal Rule of Criminal Procedure 17(c). After reviewing the personnel files in camera and concluding that they contained neither exculpatory evidence nor proper impeachment material, the district court granted the government's motion to quash the subpoena. See United States v. Dent, Cr. No. 92-223, slip op. at 6 (E.D. Pa. July 16, 1997).

We review the district court's denial of Dent's Rule 17(c) motion for abuse of discretion. See United States v. Nixon, 418 U.S. 683, 702 (1974). Thus we must uphold the district court's decision "unless it is clearly arbitrary or without support in the record." United States v. Hughes, 895 F.2d 1135, 1145 (6th Cir. 1990). "Rule 17(c) was not intended to be a broad discovery device, and only materials that are `admissible as evidence' are subject to subpoena under the

_____

2. Dent argues that Ali's method of selecting which vials to weigh was not random. We disagree with his characterization of Ali's testimony, because nothing indicates that she selectively chose which vials to weigh in a manner that would increase the estimated total weight.

18

rule." United States v. Cuthbertson, 651 F.2d 189, 192 (3d Cir. 1981). Thus although Brady v. Maryland, 373 U.S. 83, 87-88 (1963), mandates that the prosecution disclose impeachment material that is exculpatory to the defendant, it does not require that the prosecution make thefile available for the defendant's general perusal. Instead, the government need only direct the custodian of thefiles to inspect them for exculpatory evidence and inform the prosecution of the results of that inspection, or, alternatively, submit the files to the trial court for in camera review. See United States v. Jennings, 960 F.2d 1488, 1492 (9th Cir. 1992); United States v. Andrus, 775 F.2d 825, 843 (7th Cir. 1985). The district court's in camera inspection of Cassidy's personnel files fully satisfied Brady's due process requirements. Moreover, we cannot conclude that its determination that the files contained no impeachment or exculpatory material was clearly arbitrary or unsupported by the record. Accordingly, we hold that the district court did not abuse its discretion by granting the government's motion to quash Dent's subpoena of Cassidy's records.

VII.

For the reasons set forth in this opinion, we hereby affirm the district court's order in its entirety.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

19