## AUGUSTUS PINTO *v.* COMMISSIONER OF CORRECTION
### (AC 19327)

Schaller, Spear and O'Connell, Js.

Argued September 19, 2000—officially released February 27, 2001

*Adele V. Patterson*, assistant public defender, for the appellant (petitioner).

*Richard T. Biggar*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (respondent).

*Opinion*

SCHALLER, J. The petitioner, Augustus Pinto, appeals from the judgment of the habeas court dismissing his petition for a writ of habeas corpus in which he sought, pursuant to Connecticut's Interstate Agreement on Detainers (IAD),[1] to quash a detainer lodged against him by the state of New Jersey. On appeal, the petitioner claims that the court improperly interpreted the IAD

---

[1] The IAD is codified in Connecticut as General Statutes § 54-186.

to preclude relief even though he had substantially complied with its terms.[2] We affirm the judgment of the habeas court.

The following facts and procedural history are relevant to our resolution of this appeal. The petitioner is an inmate at the Enfield correctional institution. He has been incarcerated since 1963, when he was convicted and sentenced to life in prison for murder in the second degree. The petitioner was released on furlough on December 26, 1988, from which he did not return until his apprehension on January 10, 1989.

The petitioner first received notice of a New Jersey detainer on or about August 29, 1990, when he accepted delivery of the warrant. The New Jersey indictment charged the petitioner with conspiracy to commit robbery and murder in Atlantic County, New Jersey, on or about December 30, 1988 through January 3, 1989. He refused to sign the accompanying IAD form 1, although he did accept delivery of the warrant.[3] The petitioner also did not sign a form 2 that was included with the warrant and the form 1.

On August 17, 1992, the petitioner sent a written request to the records office of the department of cor-

---

[2] The petitioner, in his preliminary statement of issues, also claims that the court improperly concluded that it is a violation of the IAD to refuse to sign a document known as form 1, which provides notice of an untried indictment in another state and acknowledgment of the right to request a speedy disposition. The use of documents known as "forms" is the method of complying with IAD procedures that is employed in this jurisdiction. The petitioner's claim is addressed in our analysis of his substantial compliance claim.

[3] The following forms are relevant to the facts of this case and are provided with their corresponding titles:

Form 1—Notice of Untried Indictment or Complaint and of Right to Request Disposition.

Form 2—Inmate's Notice of Place of Imprisonment and Request for Disposition of Indictments, Informations or Complaints.

Form 3—Certificate of Inmate Status.

Form 4—Offer to Deliver Temporary Custody.

Form 5—Request for Temporary Custody.

rection (department) "concerning [his] case in New Jersey," asking for "the court papers for a speedy trial." His counselor provided him with forms 1 and 2, but the petitioner neither completed nor returned the forms to the records office. In a second written request, dated December 28, 1992, the petitioner sought "court papers for New Jersey" because he wanted to "have them for Jan. 2, 1993." The petitioner again refused to sign the form 1 that was sent with the papers on December 30, 1992.

Sometime before January 20, 1993, Michelle Humphrey, technical adviser to the records office, spoke with the New Jersey prosecutor regarding the petitioner's intent to request a speedy disposition of the New Jersey charges. The prosecutor responded, in a letter dated January 20, 1993, that "[i]t is my understanding that you believe Augustus Pinto will soon request, pursuant to the Interstate Agreement on Detainers, to have the criminal charges in New Jersey heard within 180 days. I would ask that once defendant Pinto invokes this right, you notify me at once." Humphrey informed the New Jersey prosecutor on or about January 29, 1993, that the petitioner was undergoing medical testing and would sign the speedy trial papers when he felt better.

On or about February 1, 1993, the petitioner mailed directly to New Jersey an undated request for final disposition of the charges there. In a letter to the petitioner, dated February 1, 1993, the New Jersey prosecutor responded that his "[r]equest for Final Disposition [was] legally defective and the State of New Jersey [would] not act upon it." The prosecutor directed the petitioner to discuss his speedy disposition request with his counselor. In July, 1993, the prosecutor contacted Humphrey and inquired whether the petitioner intended to file speedy disposition papers. Humphrey replied that

the petitioner still was not feeling well and would sign the papers when he was feeling better.

One year later, in August, 1994, the petitioner filed a motion for appointment of cocounsel status and a request for discovery in Atlantic County Superior Court. In response to those filings, the New Jersey prosecutor sent a letter to the petitioner, explaining that he was still considered an "inactive fugitive" and, until he completed the appropriate IAD paperwork, his status would not change.

On April 22, 1995, the petitioner sent a written request to the records office of the department, asking "that you submit the papers that are needed for me to apply for a speedy trial, under the Interstate [Agreement] on Detainers." In response to the petitioner's request, the department presented the petitioner with a form 1 dated April 24, 1995, and a form 2, dated April 24, 1995, and signed by warden John Tarascio. The petitioner refused to sign the forms. In addition to forms 1 and 2, the department completed a form 3, signed by Tarascio, and an unsigned form 4. The IAD office did not receive any of those forms. The petitioner did complete and sign a Connecticut Speedy Trial Notification and Request for Disposition form, dated April 24, 1995. The form lists the New Jersey charges and is initialed by Tarascio. The form was not, however, processed by the records office.

In May, 1995, the petitioner sent a packet of information directly to the New Jersey prosecutor. The prosecutor received the packet, dated May 10, 1995, on May 8, 1995. The packet included a letter to the prosecutor, a form 1 dated May 10, 1995, with warden Peter Matos' name appearing typed on the form, a form 2, dated May 10, 1995, signed by the petitioner, an unofficial form 1 signed by the petitioner and dated 1994, an unofficial form 3 signed by the petitioner and dated May 10, 1995, and an unofficial form 4, signed by the petitioner and

dated May 5, 1995. The "official" forms 1 and 2 that were sent to the New Jersey prosecutor contained altered dates; they were forms originally given to the petitioner in 1992 when Matos was still the warden.

In early January, 1996, the records office received two additional sets of forms 1 and 2. Because the forms were not filed according to proper processing procedures, they were placed into the miscellaneous section of the petitioner's department file. The first form 1 is dated February 2, 1996, and January 5, 1996. Matos' name appears typed on the document, although he was not the warden in 1996, and it is signed by the petitioner. Form 2 is dated January 5, 1996, and it is also signed by the petitioner. Both forms, though signed and dated in January, 1996, were photocopies of the 1992 forms previously presented to the petitioner for his signature but never returned to the records office for processing. The second form 1 is dated January 7, 1996, and contains the typed name of Matos, who was not the warden in 1996, and is not signed by the petitioner. The second form 2 is dated January 7, 1996, and is signed by the petitioner. The records office determined that, because Matos was no longer the warden in 1996, the documents were invalid.

A set of forms, all of which were dated January 7, 1996, and signed by the petitioner, was also placed in the miscellaneous section of the petitioner's master file. The forms were of inmate design rather than standard IAD forms. They included a form 1, a form 3, a form 4, and a letter titled "Request for Final Disposition." The records office considered those forms improper and declined to process them.

On January 22, 1996, and January 29, 1996, the petitioner submitted written requests asking the department records office to "make out all the court papers I need, so I can take care of this [New Jersey] matter

as soon as possible." In response to that request, department personnel prepared and provided forms 1 through 4 to the petitioner. Form 1 is dated January 30, 1996, and signed by warden Michelle Deveau, but is not signed by the petitioner. Form 2 is dated January 30, 1996, and is signed by the petitioner. Form 3 is completed and signed by Deveau, although it is not dated. Form 4 is completed but not signed by the warden. The forms were submitted to the records office for processing and were placed in section four of the inmate's master file. The records office did not forward the forms to New Jersey because the petitioner failed to sign form 1. The records office did not forward the forms to the department's IAD office.

On July 24, 1996, the New Jersey attorney general's office received directly from the petitioner a motion to dismiss the New Jersey charges for failure to prosecute, and a Connecticut Speedy Trial Notification and Request for Disposition form, completed and dated 1995.

On October 21, 1996, the Interstate Compact Office received form 5, New Jersey's request for temporary custody of the petitioner. On April 24, 1997, the commissioner of correction, John J. Armstrong, applied for a writ of habeas corpus for the petitioner in an effort to comply with New Jersey's request for temporary custody filed October 9, 1996. The petitioner was brought before the court on May 6, 1997, for a pretransfer hearing at which time he was notified of his rights in regard to the detainer. The petitioner chose not to waive his rights and objected to the involuntary transfer to New Jersey for disposition of the conspiracy charges. The court stayed the transfer and granted the petitioner until August 8, 1997, to file a petition for a writ of habeas corpus. The petitioner filed his petition on August 4, 1997. The habeas court held hearings on January 30, 1998, and March 20, 1998. The court dismissed the peti-

tion, holding that the petitioner had failed to substantiate his petition under theories of actual or substantial compliance with the IAD.

The petitioner claims that the habeas court improperly interpreted the IAD to deny the petitioner relief even though he had substantially complied with the statute. We disagree.

"Our standard of review of the petitioner's claim is plenary. We must decide whether the court's conclusion is legally and logically correct and find[s] support in the facts that appear in the record." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 60 Conn. App. 1, 8, 758 A.2d 442, cert. denied, 255 Conn. 902, 762 A.2d 908 (2000). "[T]he IAD is an interstate compact that the federal Congress has sanctioned, [therefore,] we must interpret its provisions in accordance with federal law." *State* v. *Herring*, 210 Conn. 78, 85, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989). "Because the IAD . . . has been deemed to constitute federal law[,] . . . interpretations of its provisions by the federal courts have special significance." (Citations omitted.) *Craig* v. *Bronson*, 202 Conn. 93, 103–104, 520 A.2d 155 (1987). "In searching for the applicable federal law, we may, however, look to relevant decisions in both federal and state courts." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 9 n.9.

"The IAD is designed to encourage the expeditious and orderly disposition of criminal charges pending in one state against a prisoner incarcerated in another state." (Internal quotation marks omitted.) Id., 8. One mechanism for facilitating this orderly disposition is the detainer, or a "notification filed with the institution in which the prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in

another jurisdiction." (Internal quotation marks omitted.) *State* v. *Smith*, 57 Conn. App. 478, 482, 749 A.2d 67 (2000). Article III of the IAD[4] gives a prisoner incarcerated in one state the right to demand the speedy disposition of any untried indictment that supports a detainer lodged by another state. *Carchman* v. *Nash*, 473 U.S. 716, 718–19, 105 S. Ct. 3401, 87 L. Ed. 2d 516 (1985). "Failure to comply with Article III (a) mandates dismissal with prejudice of the underlying charges." *State* v. *Herring*, supra, 210 Conn. 86. The question before us is whether the petitioner sufficiently complied with article III IAD procedures to effect his right to a speedy disposition.

[4] Article III of General Statutes § 54-186 provides in relevant part: "(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of the imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint; provided that, for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.

"(b) The written notice and request for final disposition referred to in paragraph (a) hereof shall be given or sent by the prisoner to the warden, commissioner of correction or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

"(c) The warden, commissioner of correction or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information or complaint on which the detainer is based. . . ."

"It has been held that a prisoner must first meet the burden of compliance with IAD disposition procedures before he is entitled to invoke the agreement's benefits . . . [a]lthough we recognize that the IAD is remedial legislation and that a prisoner must be given some latitude in complying with its provisions . . . ." (Citations omitted.) *Remick* v. *Lopes,* 203 Conn. 494, 505, 525 A.2d 502 (1987). It is settled that an oral request for disposition is insufficient to invoke the benefits of the IAD. Id. We further conclude that repeated disregard for IAD procedures is similarly inadequate. "[S]ince the petitioner never properly invoked the IAD, he is precluded from complaining that he has been denied his right to a speedy trial, and having the detainers lodged against him declared null and void." Id., 505–506.

Federal courts have "recognized that [s]trict compliance with Article III may not be required when the prisoner has done everything possible, and it is the custodial state that is responsible for the default. . . . [However] an inmate seeking the benefit of this exception nonetheless must show that s/he substantially complied to the extent possible." (Internal quotation marks omitted.) *United States* v. *Dent,* 149 F.3d 180, 186–87 (3d Cir. 1998), cert. denied, 525 U.S. 1085, 119 S. Ct. 833, 142 L. Ed. 2d 689 (1999); see also *Yiaadey* v. *Commonwealth,* 29 Va. App. 534, 544–46, 513 S.E.2d 446 (1999) (surveying cases requiring strict compliance with IAD procedures). Although the petitioner argues that the procedures are mere formalities, "[t]hese procedures are not mere technicalities . . . . Validation of information from the official having custody is important to prosecuting officials in the receiving state." (Citations omitted.) *State* v. *Greenwood,* 665 N.E.2d 579, 582 (Ind. 1996) (IAD's 180 day speedy trial provision not triggered where defendant fails to present to custodial authorities notice of demand for speedy trial).

Even if we were to conclude that the petitioner had substantially complied with the article III procedures, we would not conclude that the detainer should be quashed because there was no delivery to trigger the commencement of the 180 day time period. "In *State* v. *Braswell*, [194 Conn. 297, 305, 481 A.2d 413 (1984), cert. denied, 469 U.S. 1112, 105 S. Ct. 793, 83 L. Ed. 2d 786 (1985)], [our Supreme Court] interpreted the 180 day provision to require the demanding state to bring the prisoner to trial *within 180 days of the date on which the demanding state receives the prisoner's request for final disposition* and notice of place of imprisonment." (Emphasis added; internal quotation marks omitted.) *State* v. *Herring*, supra, 210 Conn. 86. "[T]he IAD unquestionably requires delivery, and only after that has occurred can one entertain the possibility of counting the 180 days from the transmittal to the warden." *Fex* v. *Michigan*, 507 U.S. 43, 50, 113 S. Ct. 1085, 122 L. Ed. 2d 406 (1993).

The petitioner argues that *Braswell* governs the disposition of his case. State officials are unquestionably bound by an independent duty to " 'promptly forward' " completed IAD documents. *State* v. *Braswell*, supra, 194 Conn. 303. *Braswell* does not, however, address the question of whether there is a duty to forward incomplete documents.

New Jersey, although aware to some degree of the petitioner's desire to request a speedy disposition of the New Jersey charges, never received a request that complied with the IAD procedural guidelines. Although Connecticut officials provided the petitioner with documents when requested, the petitioner repeatedly disregarded the relevant procedures over a period of six years. Under those circumstances, it would run counter to the purpose of the IAD to order his detainer quashed when the petitioner was, in large part, responsible for any delays in the process. Additionally, it would run counter to the *Fex* decision to require that the 180 day

clock commence before the request for speedy disposition is delivered to New Jersey, the requesting state.[5]

The judgment is affirmed.

In this opinion the other judges concurred.

[5] The respondent, in its brief, and the petitioner, in his reply brief, raise the issue of whether the petitioner was prejudiced by the delay. When assessing the "validity of a detainer . . . we . . . employ the *Barker* v. *Wingo* [407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)] test to judge the significance of the IAD delays . . . ." *Johnson* v. *Commissioner of Correction*, supra, 60 Conn. App. 11, citing *Barker* v. *Wingo*, supra, 530. Of the four factors considered in the *Barker* test, courts consider prejudice to the defendant important in evaluating the sufficiency of IAD procedures. See *State* v. *Herring*, supra, 210 Conn. 90; *Johnson* v. *Commissioner of Correction*, supra, 10. Thus, a petitioner may be required to establish that he has been prejudiced by any delay before the detainer may be dismissed. See *Johnson* v. *Commissioner of Correction*, supra, 11. Because we conclude that the respondent was not under a duty to forward incomplete IAD forms, we need not reach the question of whether the petitioner was prejudiced by the respondent's conduct.