UNITED STATES of America,

v.

Terrance PERRY, Appellant.

No. 05–1118.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit L.A.R.
34.1(a) Sept. 27, 2005.

Decided Sept. 30, 2005.

Eric Pfisterer, Kimberly A. Kelly, Office
of United States Attorney, Harrisburg,
PA, for United States of America.

Timothy J. O'Connell, Turner & O'Connell, Harrisburg, PA, for Terrance Perry.

Before RENDELL, FUENTES and
GARTH, Circuit Judges.

OPINION

GARTH, Circuit Judge:

Terrance Perry ("Perry") appeals his
conviction for possession of a firearm by a
convicted felon in violation of 18 U.S.C.
§ 922(g)(1), his conviction for possession of
a controlled substance in violation of 21
U.S.C. § 844(a), and his sentence. For the
reasons that follow, we will affirm.

I.

In the early hours of June 15, 2003,
Harrisburg Bureau of Police Officers Marshall, Swank and Sanderson ("the officers") were monitoring pedestrian traffic
at a local late-night restaurant in Harrisburg, Pennsylvania. At approximately

2:55 a.m., the officers heard four or five gunshots, and ran in the direction from which the shots had come. As they were running west on Thompson Street, a man the officers recognized as Perry[1] turned onto Thompson Street about half a block ahead of them from Evergreen Street. The intersection of Thompson and Evergreen was well-lit. The man was wearing a white T-shirt, dark jeans and a baseball hat.

The officers slowed their pace and lost sight of the running man momentarily. When they radioed that they were pursuing a suspect, however, they received a return transmission from a Corporal Wetzel reporting that he had seen a car turning around in the parking lot of the nearby YMCA. Just as the car was leaving the YMCA driveway, it came into the officers' view, and Corporal Wetzel pulled up from behind and stopped it.

There were three men in the car: Jimmy Futrell in the driver's seat, Perry in the front passenger seat and Zakaria Ajlane ("Ajlane"), a 16–year–old Moroccan national, in the backseat. Perry was wearing a white T-shirt, dark jeans and a baseball hat, so Officer Marshall "knew immediately [that he was the same person] who[m he had been] chasing because he had the same thing on." Perry was sweating and winded.

At Officer Marshall's request Perry stepped out of the car; Officer Marshall immediately noticed a small bag of crack cocaine on the ground between Perry's feet, and another bag of crack cocaine on the car floor between the passenger seat and the passenger door. Officer Marshall then "cleared the car." He saw a snub-nosed revolver with wooden grips lying under the passenger seat with its cylinder open and the chamber empty. While patting Perry down, Officer Marshall discovered a holster on Perry's belt into which the gun fit neatly, and which bore markings that matched the indentations on the side of the gun. The officers arrested and handcuffed Perry, and put him in the back of the police car.

Later that night, empty bullet cartridge casings were found outside the YMCA building. A Pennsylvania State Police forensics firearm and tool mark examiner later discovered that the four casings had been fired from the gun Officer Marshall found under Perry's seat.

Attempts to link the gun and Perry forensically were inconclusive: latent fingerprints on the gun were not of any value for comparison purposes and swabbings taken from Perry's hands about an hour after his arrest did not reveal the presence of gunshot residue. The officers nevertheless believed that it was Perry who had fired the shots they heard.

At trial, Ajlane told a different story. He testified that the gun the officers found under Perry's car seat on June 15, 2003 belonged to him, and that it was he who fired the shots that night, he who—dressed in a white T-shirt, dark pants and a baseball hat—ran from the police, and he who later threw the cartridges out the car window near the YMCA. He also testified that he threw crack out the window of the

---

1. Officer Sanderson had known Perry for a year or more, had seen him "probably ... at least once every three nights," and had spoken to him in the past. Officer Swank, too, had had "former dealings" with Perry, and so "knew exactly who it was" when he first saw the man running on Thompson Street. When Officer Marshall first saw the running man, he "didn't recognize him, but something in the back of [his] mind said, 'I think I know this guy,' but [he] wasn't sure." Minutes later, when he saw the man at a closer range, he "immediately recognized Terrance Perry," whom he had known from the neighborhood for three or four months.

car to avoid being caught with it during the arrest. According to Ajlane, Perry never possessed either the gun or the crack.

Ajlane had approached the prosecutor and case agent to tell them this story only two weeks before trial. At that meeting, Ajlane told a less elaborated version of the story, omitting several details to which he testified at trial even though the case agent had explicitly asked him if there was anything he left out. Moreover, at this meeting, Ajlane was unable to explain why, when the police stopped the car on June 15, 2003, Perry was wearing the holster for a gun that he had never possessed.

## II.

On February 11, 2004, a grand jury sitting in Harrisburg, Pennsylvania returned an indictment against Perry, charging him with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count I), possession of a stolen firearm in violation of 18 U.S.C. § 922(j) (Count II), and possession of crack cocaine in violation of 21 U.S.C. § 844(a) (Count III). At the government's request, the District Court dismissed Count II.

Perry was tried before U.S. District Judge Yvette Kane and a jury on June 9 and 10, 2004. The jury found Perry guilty of both Count I and Count III.

On January 3, 2005, the District Court sentenced Perry to concurrent terms of imprisonment of 72 months and 12 months, for the two Counts respectively. Perry did not object to the District Court's application of the Sentencing Guidelines. This timely appeal followed.

## III.

The District Court had jurisdiction over this criminal action pursuant to 18 U.S.C. § 3231. This Court has jurisdiction to review the final order of conviction pursuant to 28 U.S.C. § 1291, and to entertain the challenge to the sentence pursuant to 18 U.S.C. § 3742(a).

Because Perry did not challenge the sufficiency of the evidence at trial, we review his conviction for plain error. FED. R.CRIM. P. 52(b); *United States v. Wolfe*, 245 F.3d 257, 260–61 (3d Cir.2001). In conducting plain error review, we do not independently "weigh the evidence" or "determine the credibility of the witnesses." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir.1998). Rather, we "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *Wolfe*, 245 F.3d at 261.

Because Perry did not challenge his sentence before the District Court, we review that conviction for plain error as well. *United States v. Davis*, 407 F.3d 162, 164 (3d Cir.2005).

## IV.

### Conviction

To establish that Perry was a felon in possession of a firearm in violation of § 922(g)(1), the government was required to prove the following elements beyond a reasonable doubt: (1) that Perry had previously been convicted of a crime punishable by imprisonment for a term exceeding one year; (2) that Perry knowingly possessed a firearm; and (3) that the firearm had passed in interstate commerce. *United States v. Dodd*, 225 F.3d 340, 344 (3d Cir.2000). The government and Perry stipulated to the first and third elements. On appeal Perry thus challenges only the finding that he knowingly possessed a firearm.

■ The gun was not seized from Perry's person but was rather retrieved from underneath the passenger seat of the car. Therefore, to sustain the conviction, the government had to prove that Perry had "constructive possession" of the gun. "[C]onstructive possession requires an individual to have the power and intent to exercise both dominion and control over the object he … is charged with possessing." *United States v. Garth*, 188 F.3d 99, 112 (3d Cir.1999).

There was sufficient evidence that Perry exercised "dominion and control" over the gun. After hearing gunshots, three officers who knew Perry from the neighborhood saw—from a distance of half a block on a well-lit street—a man they identified as Perry running from the direction from which the gunshots had come. When the officers saw Perry outside the YMCA driveway, he was (1) dressed in the way the fleeing man had been dressed, (2) sweaty and winded, as though he had been running, (3) sitting in a car seat underneath which a gun had been placed, and (4) wearing a holster which fit that gun perfectly. Casings that had been fired from that gun were later found near the YMCA where the car had been stopped. Based on all of this circumstantial evidence it was reasonable for the jury to infer that Perry had shot the gun, and that he had dominion and control over the gun.

Perry argues that insufficient evidence supported his conviction for firearm possession because no one actually saw him shoot the gun, or even in actual possession of the gun. An eyewitness is not, however, a prerequisite for a conviction. We have recognized that "inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and con-

vincing connection between the facts established and the conclusion inferred." *United States v. Cartwright*, 359 F.3d 281, 287 (3d Cir.2004) (citation omitted).

Perry further argues that his conviction for firearm possession should be overturned because the forensic evidence was inconclusive. As the government's expert testified at trial, however, negative gunshot residue findings do not demonstrate conclusively that the individual tested did not fire a gun. The friction created by Perry's handcuffed hands rubbing against the seat of the police car in which he rode to the station could easily have wiped any gunshot residue away.

Perry argues finally that Ajlane's testimony that *he* rather than Perry possessed and shot the gun should have prevented his conviction for firearm possession. It is true that the jury could have found Ajlave's testimony credible and chosen to believe it, instead of crediting the prosecution's witnesses and believing the alternate theory the government presented based on their testimony. They did not do this, however, and it is not this Court's job "to weigh the evidence or to determine the credibility of the witnesses." *Dent*, 149 F.3d at 187 (citation omitted). Instead, this Court must "presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." *United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir.1992). There was sufficient evidence to sustain Perry's jury conviction for possession of a firearm by a convicted felon.

Perry also challenges the sufficiency of the evidence that he violated 21 U.S.C. § 844(a),[2] but he does not make any specific arguments in support of this challenge.

---

**2.** Pursuant to § 844(a), it is unlawful for "any person knowingly or intentionally to possess a controlled substance …" *See Gerbier v. Holmes*, 280 F.3d 297, 316 (3d Cir.2002).

Officer Marshall testified at trial about his discovery of the crack in question:

> I asked Mr. Perry to step out of the vehicle, he came out of the vehicle, and immediately, when he came out, I looked down, and there was a small bag of crack cocaine right at his feet. Like, step out of the car, it was just, you know, right in between his feet.

(App. 37).

> Q: The crack you saw at the defendant's feet, where was he standing at the time that you saw that?

> A: He was standing right in the door. Right when you open the passenger door and you actually put your feet on the floor—It's like you turn, put your feet on the floor, on the ground, and you stand up, the crack was right in between your ankles, your insteps. That's where it was sitting on the ground.

> Q: At what point did you see that crack cocaine? How long had the defendant been outside the car before you saw it?

> A: Maybe two seconds as I was patting him down. As I was patting him down, I went down, and I saw the crack right between his feet as I was doing the patdown.

> Q: So you didn't actually see the crack fall from his person, you simply noticed it on the ground at his feet. Is that correct?

> A: Yes, that's correct.

(App. 54–55). A rational trier of fact could have found proof of guilt beyond a reasonable doubt based on inferences drawn from this evidence.

*Sentence*

■ On January 3, 2005, Judge Kane sentenced Perry, as she was required to do at the time, under the then-mandatory Sentencing Guidelines.[3] Nine days later, the U.S. Supreme Court handed down its opinion in *United States v. Booker*, 543 U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). In *Booker*, the Court held, *inter alia*, that 18 U.S.C. § 3553(b)(1)—the provision of the Sentencing Reform Act that made the Guidelines mandatory—was unconstitutional, and that it must be severed and excised from the Guidelines. *Booker* transformed what had been mandatory guidelines into advisory guidelines for the information and use of the district courts in whom discretion has now been reinstated. Perry filed his appeal on January 12, 2005—the very day *Booker* was decided.

In *Davis*, an *en banc* panel of this Court considered how sentences such as Perry's that were on direct appeal when *Booker* was decided should be handled. We noted:

> Because the sentencing calculus was governed by a Guidelines framework erroneously believed to be mandatory, the outcome of each sentencing hearing conducted under this framework was necessarily affected. Although plain error jurisprudence generally places the burden on an appellant to demonstrate specific prejudice flowing from the District Court's error, in this context where mandatory sentencing was governed by an erroneous scheme prejudice can be presumed ... [A]s noted by the Court of Appeals for the Sixth Circuit, "[w]e would be usurping the discretionary power granted to the district courts by *Booker* if we were to assume that the

---

**3.** Perry's total offense level was 20 under the Sentencing Guidelines. Combined with his criminal history category of VI, this offense level yielded a Guideline imprisonment range of 70–87 months. Judge Kane imposed an aggregate sentence of imprisonment for 70 months, at the bottom of this range.

district court would have given [defendant] the same sentence post-*Booker.*" *United States v. Oliver,* 397 F.3d 369, 380 n. 3 (6th Cir.2005). Failure to remand for resentencing, therefore, could adversely affect the fairness and integrity of the proceedings. Accordingly, defendants sentenced under the previously mandatory regime whose sentences are being challenged on direct appeal may be able to demonstrate plain error and prejudice. We will remand such cases for resentencing.

407 F.3d at 165.

We will vacate Perry's sentence and remand for resentencing in accordance with *Booker.*